**UNITED STATES of America,
Appellee.**

v.

**Robert T. CARSON, Defendant-Appellant.**

**No. 685, Docket 72–1123.**

United States Court of Appeals,
Second Circuit.

Argued April 13, 1972.

Decided July 7, 1972.

Henry J. Boitel, New York City, for appellant.

Robert G. Morvillo, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, Joseph Jaffe and Peter F. Rient, Asst. U. S. Attys., on the brief), for appellee.

Before FRIENDLY, Chief Judge, and SMITH and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Robert T. Carson appeals from his convictions, following a jury trial, for conspiracy to travel in interstate commerce in furtherance of bribery, in violation of 18 U.S.C. § 371, and for perjury before a federal grand jury, in violation of 18 U.S.C. § 1621.[1] While our decision to affirm appellant's convictions turns on the interpretation of technical language of the criminal code, the result obtaining has certain precedential value concerning interrelationships of influence between the Congress and the Executive. Thus we review the pertinent facts of the case with some particularity.

In the fall of 1970, co-defendant Joseph Bald and one Michael Hellerman discovered they were under scrutiny by the Securities and Exchange Commission and the United States Attorney's office for the Southern District of New York in connection with certain stock transactions. At Hellerman's suggestion and with the help of co-conspirator Harold Blond, Bald in November 1970 met with a New Yorker named Edward "Eddie" Adams, an older gentleman who supposedly carried a lot of political influence in Washington, to attempt to arrange a "fix" on the investigations.

Adams was agreeable, but indicated the "fix" would be costly ($50,000–$100,000) and that he, Adams, would need "front" or "seed" money of between $2,000 and $2,500. Bald, however, would not part with seed money until there was assurance that some success to the venture would be in the offing. Adams then said he would try to introduce Bald to appellant Carson, who was the Administrative Assistant to United States Senator Hiram Fong, and he indicated that the big money would go to Senator Fong[2] and "to individuals in the Justice Department."

As a result of Adams' effort, in mid-November Bald and Hellerman met in Washington, at Senator Fong's office and at the Senate cafeteria, with Carson. Hellerman allegedly told Carson of the investigations, that indictments were expected shortly, and that if Carson could "squash" all the SEC matters, "we will pay you $1,000,000." Carson inquired about the identity of the Assistant United States Attorney who was involved and whether the indictments could be delayed. Hellerman told him the name and that delay was unlikely. Indeed, in November 1970 an indictment charging various violations of the federal securities laws was filed in the Southern District of New York [United States v. Dioguardi, 70 Crim. No. 967 (S.D.N.Y., filed Nov. 19, 1970)] against Hellerman, 15 other defendants and Bald as a co-conspirator. The next day Adams related to Blond that Carson had informed him that he (Carson) was disturbed about the people indicted and, at best, that he could help only Hellerman and Bald.

On November 24, 1970, appellant Carson met with (then) Deputy Attorney

---

1. Carson was sentenced to concurrent terms of imprisonment for 18 months on the conspiracy and perjury counts and was fined $5,000 on the conspiracy count. The jury found Carson not guilty on two counts under 18 U.S.C. § 1952, charging him with traveling in interstate commerce in furtherance of the unlawful activity of bribery.

Two co-defendants, Edward Adams and Joseph Bald (not charged with perjury),

pleaded guilty before trial on separate counts. Bald testified for the Government and was later sentenced to imprisonment for two years, 20 months of which were suspended. Adams, an octogenarian, received a suspended sentence with three months' probation and a $5,000 fine.

2. No suggestion has been made that Senator Fong knew of, or was in any way involved in, any of the events leading to Carson's conviction.

General Richard Kleindienst at the Department of Justice in Washington. At Carson's trial, Kleindienst testified that the meeting lasted 15 minutes, the first minute or two of which he described as follows:

Well, after we had exchanged pleasantries, Mr. Carson sat down in a chair in front of my desk and said that he had a friend in New York who was in trouble, and that if I could help him with respect to his trouble, his friend was a man of substantial means and would be willing to make a substantial contribution of between fifty and one hundred thousand dollars to the reelection of President Nixon.

I asked him what kind of trouble this man had. Mr. Carson said that he was under indictment for federal offenses, and I said that under no circumstances could I do anything about the matter, even look into it, as a result of the fact that a grand jury had returned an indictment.

That was just about all the conversation that existed.

We immediately thereafter—we turned the subject matter to other matters [which Kleindienst thereafter testified concerned a judicial appointment from the State of Hawaii].
. . . [3]

Not long after the filing of the indictment, Hellerman informed Bald that he had someone who would furnish the large sum necessary to fix the case and that he wanted that person to meet Adams. Again through the intercession of Blond, Bald and Adams held a meeting, at which Bald said that Adams should forget about the 15 defendants, helping only Bald and Hellerman, and that he wanted Adams to meet the money man, who would be willing to pay $200,000. Adams again wanted "seed money," but Bald put him off; thereafter, a rendezvous was arranged for November 29, 1970, at La-Guardia Airport, to discuss the fix.

Bald, Blond and Hellerman arrived at the airport before Adams did, and Hellerman, now aiding the Government, brought with him FBI Special Agent Paul Brana, whom he introduced to the others as Paul Bicera, the sponsor of the fix. Brana pretended skepticism of Adams' influence, which Blond offset with name-dropping and a tale of Adams' political influence record in Washington. Blond also told Brana that Senator Fong was a member of the Judiciary Committee and could handle the matter; that at the first meeting of Carson, Bald and Hellerman, Hellerman was mistaken in mentioning $1 million; and that a fix on the pending indictment and any future indictments would cost $200,000.

Adams then joined the other four at the airport and explained to Brana that he knew all about the case, that Carson had not had time to act on the first indictment, that Senator Fong was indeed influential as a member of the Judiciary Committee and that both Senator Fong and Attorney General Mitchell had given their handshakes on the matter. Brana again portrayed skepticism, and Adams said he would set up a meeting between Carson and Brana so the latter could be personally persuaded.

On December 1, 1970, Blond, Adams and Brana, who was wearing a recording device, flew from New York to Washington and met with Carson in Senator Fong's office. Following introductions,

---

3. Appellant, on the other hand, contended at the trial that the meeting was arranged primarily to discuss the judicial appointment, and gave this testimony concerning his friends' problem:

I said to Mr. Kleindienst that a couple of men had talked to me about a problem they had, and that they were willing to make a contribution to the Republican party in the amount of $50,000 or so.

Subsequent to their talking to me, I saw in the papers where there was an SEC indictment. I told him that I had said to these people that there was nothing that I could do in the matter and I was just relating it to him for his confirmation.

\*   \*   \*   \*   \*

He said "You're right, Bob; there is nothing you can do for anyone under indictment."

Carson stated that he had previously been told that "he [apparently Hellerman] had a means in which he could hold off the prosecutor" on the indictment. Had they been successful, he added, "we might have been able to do something. The next day it hit the papers and for us to ask for the case from New York after it hit the papers then all of the newspapers would wonder why."

The tape from the recording device on Brana's person then revealed a conversation between Brana and Carson, in which Carson convinced Brana that nothing could be done about the matter owing to the involvement of the other defendants and of the Assistant United States Attorney, which made the case "too hot." In the following taped discussion, Carson alluded to possible future leniency and to his earlier talk with the Deputy Attorney General:

Brana:    In other words it's a dead issue. Is that what you are saying in fact?

Carson:   Later on we might be able to do something for these two.

Brana:    But as far as the two fellows we are interested in there is no chance to get it squashed.

Carson:   No, and that's from the top man.

Brana:    That's from the top man? Okay, what more can we say. We tried and we appreciate your efforts.

. . . .

Carson:   . . . [I]f he feels that he wants me to make inquiries, my advice right now is don't waste your energy and your money, save them for the possibility that sometime you might be doing some good with it. I don't care who you go to now.

After the meeting Brana told Adams that the $200,000 had not been deposited in a bank as previously arranged. Adams left Blond and Brana, who returned to New York; on the trip Brana first learned that he was supposed to have brought $2,000 to give to Carson.

On December 22, 1970, Bald, Hellerman and Brana met at a New York restaurant. Bald told Brana that he was concerned about the possibility of new indictments and that Brana should make the $200,000 bank deposit in anticipation of another meeting in Washington that Adams was going to arrange. Two days later Brana met with Hellerman and Adams in New York; Adams reported that Carson could take care of the new indictments and that "the new price for the handling of the indictments would be $100,000 and that a schedule could be worked out between Mr. Carson and [Brana] depending upon what Mr. Carson could do for us." Brana then gave Adams $200 expense money that Adams requested of him, and also showed him $2,500, which was to be given to Carson. Arrangements were made for making another appointment with Carson.

On December 29, 1970, Brana, again equipped with a recording device, flew to Washington and met Adams at a hotel. There Adams asked him for another $200 expense money and for the $2,500 for Carson. Brana gave both to Adams after Adams said he would give the $2,500 to Carson in Brana's presence. Upon meeting Carson in Senator Fong's office, Adams immediately handed him the $2,500 cash. Carson asked, "For the [inaudible on the tape] Senator?"

Carson testified that the $2,500 was a campaign contribution for Senator Fong from one Robert Brinsmade. The cash payment, according to Carson, was made after he [Carson] had earlier returned as improper a corporate check made payable to "Cash," signed by Brinsmade and given to Carson by Adams. Brinsmade was not called to testify at trial.

The defendant contended at the trial that the tape then disclosed Adams' voice saying "Mr. Carson," with Carson replying, "Fine, thank you very much." The Government's version of the same

tape, supported by the testimony of Agent Brana, read as follows:

Adams: Mr. Carson, for you sir

Carson: Fine

Adams: For Christmas

Carson: Thank you

Adams: Look

Carson: Very much

Thereafter a discussion ensued in which Brana explained that he was there for the same purpose as before, but that new indictments were expected. He stated that the leniency Carson had discussed at their first meeting would surely be impossible if the men were indicted again. Carson switched the subject for a moment, and then inquired about the status of the new charges, particularly against Bald. Brana stated that Bald thought he was going to be indicted, and said to Carson: "Now Mr. Adams indicated that you could possibly work through, you know, whoever handles those matters, I don't know." Carson replied, "And you don't know and you don't want to know [inaudible on tape]."

Carson then indicated that he was not sure that he could do anything for Brana's friends as the matter might be "over my head," and in view of the involvement of the "United States Attorney's office up in New York." He stated, however, that he needed to know whether the new indictments had been handed down, and when Brana told him Bald thought they were in preparation, Carson said, "Let me work on that," and, "Well we'll find out what we can do, if we can do anything."

Thereafter the subject turned to money, and the tapes revealed the following conversation:[4]

Brana: a lot of money involved right, we're not talking $10,-000 right, we just put 2500 down, we're talking, you know you originally come to me and were talking $200,-000 right?

Adams: No, No,

Brana: That was the original figure that was

Adams: Yes

Brana: quoted to me

Adams: No, hundred

Brana: Now it's a hundred thousand

Carson: Yes

. . . .

Brana: and this actually what it is an investment. We're putting up front money but ah

Carson: Well I don't want [inaudible] any strings attached

Brana: No, no strings attached whatsoever, the only you know, I mean you're trying to do something for us and uh but you know I'd like to get some idea as to how, uh you know, like supposen that you can handle it, the indictments, the SEC indictments and there's leniency and maybe the guy does six months, I'd like to know what the arrangements would be for payments or what you would expect.

Carson: It will be all spelled out.

Brana: OK. Very good.

The next day, December 30, 1970, Carson was served with a subpoena to appear before a federal grand jury in the Southern District of New York on January 6, 1971. As a witness before the grand jury Carson was told that the investigation concerned potential crimes of

---

4. Prior to the discussion of the specific amount of money involved, Brana and Carson had this dialogue:

Brana: All right well let's say that supposing that ah, no you can stop the indictments for 'em. New indictments do come down right. Assuming that they are, that we do find out that they are ready to put them down.

Carson: Yeah, we'll let you know? Ah, ah the way these things work is that if something could be done, somebody will make a suggestion to me that it would be very nice if a contribution would be made to (inaudible).

Brana: Right.

conspiracy and bribery of public officials, and was advised of his constitutional rights and that he may be a target of the investigation. In his testimony Carson denied knowing Hellerman, Bald, Adams and Bicera (Agent Brana's undercover name), and, when shown a photograph of Brana, denied recognizing him.

In this court, appellant's principal attack is directed toward the trial court's charge to the jury concerning conspiracy to commit bribery [5] and especially its failure to define clearly the term "official act" as found in the bribery statute.[6] In its main charge on the conspiracy count, the court read 18 U.S.C. § 201(b), which applies to the offering or giving of a bribe, and § 201(c) which applies to soliciting or receiving a bribe, but did not read the definition of or otherwise define "official act" as found in § 201(a) and used in § 201(b) (1). The court further instructed the jury that it could find the existence of a conspiracy if it found, *inter alia,* a purpose of the conspiracy was

to influence either Mr. Robert Carson, as Senator Fong's administrative assistant, or Mr. Kleindienst as Deputy Attorney General, or any other official of the Department of Justice to do anything to discontinue or attempt to quash . . . a prosecution of a case pending . . . in the Southern District of New York, and it was the intention to do that either by offering or giving money to Carson or

---

5. The conspiracy statute, 18 U.S.C. § 371, reads as follows, in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

6. The portions of the bribery statute, 18 U.S.C. § 201, pertinent here, are:

(a) For the purpose of this section: "public official" means Member of Congress, the Delegate from the District of Columbia, or Resident Commissioner, either before or after he has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government or a juror; and "person who has been selected to be a public official" means any person who has been nominated or appointed to be a public official, or has been officially informed that he will be so nominated or appointed; and "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit.

(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—

(1) to influence any official act; or

(2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of his lawful duty, or

(c) Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:

(1) being influenced in his performance of any official act; or

(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) being induced to do or omit to do any act in violation of his official duty; or . . . . .

by Carson's taking of money to give to anyone else, or to use as a political contribution . . . .[7]

After deliberating for approximately 13 hours, the jury sent a note to the trial court requesting, *inter alia*, clarification of the definition of bribery and the role played therein by the term "public" (meaning "official") act.[8] Following a discussion of the jury's questions and his proposed answers with counsel, the court in a supplemental charge read to the jury 18 U.S.C. § 201(b) and the "official act" definition from 18 U.S.C. § 201(a). In response to jury question number 4, note 8 *supra,* which was directed to the scope of the term "official act," the court instructed:

It is not necessary to find that the action or result sought by whoever hypothetically gives the bribe is something that was in fact within the power of the official in question. It would not be possible, on the other hand, for you to find a case of bribery if the action sought was so far outside the purview of the official's duties or possible power or possible authority that it would

---

7. With respect to its instructions on Counts Two and Three, charging the substantive violations of traveling in interstate commerce in furtherance of the bribery under 18 U.S.C. § 1952, the court stated that the crime "applies both to the giving and the receiving, to the offering or the soliciting of money or things of value, and that the giving or offering or soliciting or receiving must be for the purpose of having a public official influenced in his performance of any official act or omission in the course of his duties."

8. The pertinent questions read:

We would appreciate a selective (underscored) rereading and expansion of the definition of bribery, which we understand in substance to be the giving of something of value to a public official with the intent to influence any public act or the acceptance or agreement to accept anything of value to influence a public act by a public official.

If proper, it would be helpful if the expansion covered the following questions:

1. What is a public act as defined in the law?

2. What is the relevance of the legality of the public act, that is, if an official agrees to do something that is completely legal in return for something of value, has he committed bribery?

3. Does the something of value the official receives or agrees to receive have to be for himself? For example, would the acceptance of a political contribution for a political party constitute the acceptance of something of value?

4. Is the public official's actual ability to influence the public act relevant to the charge. That is, if an official agreed to accept something of value to influence, would that constitute bribery?

5. If the legality of the public act is an issue, could you define the legality of the following acts by a public official, such as a congressional administrative assistant:

(a) Attempting to determine from or influence the Justice Department in the timing of handing down an indictment in a criminal investigation.

(b) Inquiring among Justice officials as to either the status of or probable entrance—outcome or probable outcomes of an investigation in progress.

(c) Acts referred to in the questions on leniency following.

As you know, there are several references to the seeking or obtaining of leniency in this trial. A confusion exists in the minds of the jurors as to whether and under what circumstances this seeking of leniency at or prior to the time of sentencing by an individual (third party) not party to a trial is legal and/or illegal. An understanding of the distinction between legal and illegal aspects of the above type of activity has become important to our deliberations. Therefore, we request information and/or instructions from you concerning this.

Among other things, we seek to learn:

(a) Is it legal or illegal for a third party to bring forth pertinent information which may influence the weight of a sentence?

(b) Is it legal or illegal for a third party to attempt to discuss such information with:

1) A judge; 2) The Justice Department; 3) Attorney for the defense?

(c) Is it legal or illegal for a government official to participate in either of the activities described in (a) and (b) above?

Parenthetically, it may be said to those who would do away with the jury system, the acuity of this jury might be pondered.

be unreasonable for any reasonable man to have supposed he could have done anything about that particular subject.

The court also presented hypothetical situations involving bribery and the conduct of official acts. Shortly after the giving of the supplemental charge, the jury brought in its verdict.

Appellant's principal claim, in summation of all the foregoing, is that he was improperly convicted because the charge permitted the jury to convict if it found solely that a purpose of the conspiracy was to influence Carson, as an Administrative Assistant, by the offer of money to him for the purpose of quashing the prosecution or obtaining leniency. Carson does not deny that on the evidence he properly could have been convicted of conspiring to bribe the Deputy Attorney General to quash the prosecution. He contends, rather, that he may have been convicted for conspiracy to take a bribe to exert his personal influence as a congressional aide to achieve the illegal objective. Personal influence, he claims, is not within the scope of the bribery statute, for it is inconsistent with the term "official act." Appellant, therefore, contends that the court should have charged the jury to acquit if the action sought were "so far outside the purview of the official's *official* duties or possible *official* power . . . ." and should have emphasized that the mere fact that one is an official and has *political* or other type of *unofficial,* personal influence does not satisfy the requirements of the bribery statute.

■ The Government rightfully asserts that appellant's attack on the court's charge is untimely. He did not request a charge defining "official act" or distinguishing between "official" and "political" or "personal" influence; his only objection on point at the close of the main charge was so general as to be unavailing,[9] he consented to the reading of the bribery statute and its definition of "official act" in the supplemental charge, and he did not take an exception at the close of the supplemental charge.[10] Ordinarily, of course, appellant would thus be precluded from objecting to instructions for the first time on appeal. Fed.R.Crim.P. 30; *see* United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

We do inquire, however, whether the charge was plainly erroneous under Fed. R.Crim.P. 52(b). The parties agree that appellant properly could have been convicted under 18 U.S.C. § 201(b), that is, for conspiring to offer a bribe to Kleindienst for the purpose of terminating or otherwise influencing the prosecutions. If, however, the jury believed Carson's recollection of his conversation with Kleindienst, see note 3 *supra,* which would no doubt lead them to disbelieve the Government's theory that Carson had conspired to bribe Kleindienst, both of which draw support from the jury's questions, see note 8 *supra,* appellant's conviction could be based only upon the charge under § 201(c), that Carson himself conspired to take a bribe in return for exerting his own influence for the illegal purposes. In the same light,

---

9. We respectfully except to that portion of your Honor's charge in which you paraphrase essentially the statutes here in issue. . . . [R]eading the statutes and then giving them the elements of the statutes, sandwiched in between would only serve to confuse the jury.

10. Moreover, appellant conceded that the position taken by the trial court vis-a-vis congressional administrative assistants and official acts was correct:

The Court: Let me ask you so I understand your position again. If an administrative assistant to a senator is given some money and the conversation is like this: "Mr. Administrative Assistant, here is X dollars. I would like you to go to Judge A and urge him to be lenient in sentencing B," would that be a bribe?

. . . .

Appellant's Counsel: Yes, sir.
The Court: It would be?
Appellant's Counsel: I think so.

while a conviction under § 201(c) (2) (based on fraud) would nevertheless be quite proper on the evidence, the same under § 201(c) (1) or (3) would necessitate a clear understanding on the part of the jury of the meaning of "official act" [(1)] and "act in violation of his official duty" [(3)].

The wording of the statutory definition of "official act" (which was read to the jury) nearly upsets appellant's argument at the start. Such an act is "any decision or action on any question, matter, cause, suit, proceeding or controversy" at any time which might "by law be brought before any public official, in his official capacity, or in his place of trust or profit." 18 U.S.C. § 201(a). Yet appellant contends that any bribe he might have been found to have taken could only be one in return for his being influenced in his personal or political capacity and in the performance of a personal act. *Compare* 18 U.S.C. § 201(c) (1), note 6 *supra.*

The terms of the written definition of official act have not been altered to any substantial extent since their origin in the Act of July 13, 1866, ch. 184, § 62, 14 Stat. 168. In 1962 Congress consolidated the various prior criminal statutes dealing with bribery into section 201, with the stated purpose of making, in the words of the Senate Report, "no significant changes of substance and, more particularly, [not restricting] the broad scope of the present bribery statutes as construed by the courts." 1962 U.S. Code Cong. & Ad.News, pp. 3852, 3853.

There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision. *See* United States v. Heffler, 402 F.2d 924 (3rd Cir. 1968), cert. denied, Cecchini v. United States, 394 U.S. 946, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969); Parks v. United States, 355 F.2d 167 (5th Cir. 1965); United States v. Labovitz, 251 F.2d 393 (3rd Cir. 1958); Wilson v. United States, 230 F.2d 521 (4th Cir.), cert. denied, 351 U.S. 931, 76 S.Ct. 789, 100 L.Ed. 1460 (1956); Krogmann v. United States, 225 F.2d 220, 225 (6th Cir. 1955); Hurley v. United States, 192 F.2d 297, 300 (4th Cir. 1951); Canella v. United States, 157 F.2d 470, 480–481 (9th Cir. 1946). The policy foundation on which this interpretive approach rests is central to the administration of justice at all levels of representative democracy:

> It is a major concern of organized society that the community have the benefit of objective evaluation and unbiased judgment on the part of those who participate in the making of official decisions. Therefore, society deals sternly with bribery which would substitute the will of an interested person for the judgment of a public official as the controlling factor in official decision. The statute plainly proscribes such corrupt interference with the normal and proper functioning of government.

United States v. Heffler, *supra*, 402 F.2d at 926, quoting United States v. Labovitz, *supra*, 251 F.2d at 394.

■ While "[n]ot every person performing any service for the government, however humble, is embraced within the terms" of the bribery statute, Krichman v. United States, 256 U.S. 363, 366, 41 S.Ct. 514, 515, 65 L.Ed. 992 (1921), appellant, as an administrative assistant to a member of the Senate Judiciary Committee, clearly is, in a situation in which his influence in connection with federal criminal charges or penalties is sought. 18 U.S.C. § 201(a). The United States Supreme Court, in United States v. Birdsall, 233 U.S. 223, 230–231, 34 S.Ct. 512, 514, 58 L.Ed. 930 (1914) (citations omitted), has written:

> Every action that is within the range of official duty comes within the purview of these sections [antecedents of 18 U.S.C. §§ 201(b), (c)]. . . . To constitute it official action, it was not necessary that it should be prescribed by statute; it

was sufficient that it was governed by a lawful requirement of the Department under whose authority the officer was acting. Nor was it necessary that the requirement should be prescribed by a written rule or regulation. It might also be found in an established usage which constituted the common law of the Department and fixed the duties of those engaged in its activities. . . . In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery.

Appellant testified that as a part of his job and under the applicable "procedure that goes on at Capitol Hill," he as an administrative assistant to Senator Fong would exert influence on various agencies and branches of the Government "without any strings attached." This would be done on behalf of the Senator's constituents and political contributors and their friends to help them with their problems. In this case, however, appellant argues that if he did accept a bribe to help the "friends" here involved, through the use of influence, he was embarking not on an official act but merely on a "personal frolic of his own," quoting the unrelated case of United States v. Cho Po Sun, 409 F.2d 489, 491 (2d Cir.), cert. denied, 396 U.S. 864, 90 S.Ct. 140, 24 L.Ed.2d 118 (1969).

■ Appellant's contention is misguided. That administrative assistants as part of their "duties" exert the influence inherent in their employment relationship with members of Congress appears "clearly established by settled practice," in the language of United States v. Birdsall, *supra*, 233 U.S. at 231, 34

S.Ct. 512.[11] Moreover, even if the objective of the use of influence here might be categorized as "personal," the determinative factor is that the primary source of any conceivable influence on the Justice Department was the official position held by appellant, enhanced as it was by the status of his employer's membership in the one most powerful congressional committee affecting that Department's operations. It cannot be forgotten that the Attorney General's authority over federal criminal prosecutions is the broadest, 28 U.S.C. §§ 509, 516, but also involves ultimate responsibility for the administration of "all Federal penal and correctional institutions." 18 U.S.C. § 4042(1).

It is the corruption of official positions through misuse of influence in governmental decision-making which the bribery statutes make criminal.

■ The evidence, especially the tape recordings of December 29, convinces us that it would not be unreasonable for the jury to have believed that Carson conspired to accept a bribe in return for an unlawful exertion of the influence inherent in his official position as a member of the staff of a member of the Senate Judiciary Committee. Apparently he, and those bribing him, thought he had access to the Justice Department through his position that would enable him to alleviate, if not altogether quash, pending Justice Department action or bring about lenient post-conviction treatment. Thus, while the court's charge as to official act may have been narrow in terms of what it could have been if the language of *Birdsell*, *supra*, 233 U.S. at 230–231, 34 S.Ct. 512, had been utilized, we hold that the charge was in no manner misleading and that appellant's conduct herein constituted an official act within the meaning of the bribery statute.

11. The closeness of the relationship and its effect have been stated, in another context, as follows:

It is not only accepted practice, but, we would think indispensable, for a legislator to have personal aides in whom he reposes total confidence. This relationship could not exist unless, during the course of his employment, the aide and the legislator were treated as one.

United States v. Doe, 455 F.2d 753, 761 (1st Cir. 1972).

■ Also in relation to the conspiracy count (Count One), appellant maintains that the moving papers were duplicitous in that the single count charged both (1) that the defendants conspired to quash an investigation and a pending indictment by offering a $100,000 political contribution to the Deputy Attorney General of the United States; and (2) that the conspirators agreed to pay $2,500 to appellant to obtain leniency for Joseph Bald and to prevent further indictments. A pretrial objection on this ground was made in a motion to dismiss, and appellant requested on the eve of trial that the Government be required to elect which conspiracy it would prosecute. The court below denied the motion and the request, results with which we agree. It is well settled that "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'" Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) (citations omitted); cf. United States v. Barash, 412 F.2d 26, 34–37 (2d Cir.), cert. denied, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). See also United States v. Lubomski, 277 F.Supp. 713, 716–719 (N.D.Ill.1967); 1 C. Wright, Federal Practice & Procedure § 142, at 306–10 & cases cited 310 n. 20 (1969). Count One set forth two means, which fell within alternative provisions of 18 U.S.C. § 201, by which the Government contended 18 U.S.C. § 371, the conspiracy statute, was violated; hence, it was not duplicitous.

Another of appellant's contentions is that he was deprived of a fair trial as a result of certain testimony given by then Deputy Attorney General Kleindienst. Apparently to convince the jury that appellant had not attempted to offer a bribe to Kleindienst on November 24, 1970, defense counsel on cross-examination elicited from Kleindienst that he had made no report of that day's conversation with Carson until a week later, after he had been shown, on December 1, 1970, a memorandum from the Director of the FBI to the Attorney General about an investigation involving Carson. Kleindienst then testified that on November 24, 1970, he did not think that in their conversation Carson had offered him a bribe, and that had he thought so, he would have reported it immediately.

■ On redirect examination the trial judge disallowed questions relating to the nature of the information contained in the FBI memorandum. Kleindienst then responded affirmatively to the question, "After learning what you learned on December 1, 1970 with regard to the fact that there was an investigation involving Mr. Carson, did you then consider what had happened on November 24th to have been a bribe offer?" Although defense counsel made no objection to this testimony at the time it was given, appellant now argues that because it was based on hearsay and called for Kleindienst's opinion as to whether appellant was guilty of the crime charged, the testimony was so extremely prejudicial and violative of appellant's sixth amendment confrontation rights as to deny him a fair trial.

The question on redirect, unlike that on cross-examination, undoubtedly was prejudicial; furthermore, it called for a statement of opinion based not upon personal observation but upon inadmissible hearsay evidence, i. e., the government memorandum. Hence, the answer elicited was not qualified by knowledge and was objectionable. See 2 J. Wigmore, Evidence § 657, at 762 (3rd ed. 1940).

We do not find plain error in this admission, however. The question arose on redirect. It was in rebuttal to a matter probed on cross-examination, seeking to cast doubt on the witness's credibility at trial. It ill behooves the defense to argue prejudice here, having failed to object to the improper question on redirect, when the reach of the cross-examination invited, if not required, explana-

tion by the witness of his failure to recognize in the first instance an approach which the Government now was prosecuting as an attempt to bribe.

■ Appellant raises two novel claims to defeat his conviction for perjury. The first is that his invocation of his fifth amendment privilege against self-incrimination before the grand jury, just after his perjurious testimony, amounted to an implicit recantation of those prior responses. This argument is wholly devoid of substance. There is no real evidence that appellant testified mistakenly [12] or carelessly, and hence United States v. Norris, 300 U.S. 564, 57 S.Ct. 535, 81 L.Ed. 808 (1937), stands squarely in his way; moreover, as the Government correctly points out, assertion of the fifth amendment privilege does not by itself imply any fact. *See* Grunewald v. United States, 353 U.S. 391, 415–424, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

■ The second claim is that since the prosecution had the tape recordings of the conversations held in Senator Fong's office as well as the testimony of Brana and Hellerman, there was no doubt whatsoever that appellant had met the persons inquired about, and therefore appellant's answers to the questions were not material to the grand jury investigation. Appellant misunderstands the purpose and operation of the perjury statute, 18 U.S.C. § 1621. "Essentially, the statute punishes lying under oath before a federal official or tribunal . . . . To be within the reach of section 1621, the lies must be material, which in this case means that 'the false testimony . . . [must have] a natural effect or tendency to influence, impede or dissuade the grand jury from pursuing its investigation.' " United States v. McFarland, 371 F.2d 701, 703 (2d Cir. 1966), cert. denied, 387 U.S. 906, 87 S.Ct. 1689, 18 L.Ed. 2d 624 (1967); United States v. Marchisio, 344 F.2d 653, 665 (2d Cir. 1965).

The "natural effect or tendency" obviously flows from an assumption on the part of the speaker that the tribunal will believe what he says. On this basis materiality refers to the connection between the words said only by the accused and the objective of the investigation; other testimony which the grand jury has heard, except as it may tend to delimit the objective of the inquiry, is therefore irrelevant to a determination of materiality. And we think it equally obvious that had appellant's false statements been believed, the natural effect would have been to impede the grand jury's investigation.

■ Appellant raises several additional claims which do not warrant extended discussion. His claim that the refusal of the trial court to sever the perjury count from the remaining counts of the indictment deprived him of a fair trial is controlled by United States v. Sweig, 441 F.2d 114, 118–119 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L. Ed.2d 711 (1971). There as here the commonality of proof of the conspiracy and perjury crimes permitted joinder of the offenses under Fed.R.Crim.P. 8(a) and denial of appellant's Rule 14 pretrial motion for severance. Furthermore, since appellant failed to renew his motion for severance of the counts on the eve of the trial, there is authority that he may not raise the claim on appeal. *Id.* at 119.

Appellant next asserts, with reference to the tape recordings and transcripts of them, that the trial court erred: (1) in admitting the tapes into evidence; (2) in not instructing the jury that they could reject the tapes in whole or in part because portions were inaudible; and (3) in allowing the jury to retain the transcripts during the trial. We disagree.

Prior to trial the court ordered counsel for both parties to listen to the tapes to

---

12. Appellant argues he was mistaken. *E. g.*, he caims to have known Edward Adams only as Eddie Adams, therefore accounting for his nonrecollection of the former name.

determine where they disagreed as to the words heard on the tapes. An *in camera* hearing was later held, prior to the introduction of the tapes or transcripts into evidence, and three transcripts were made of the tapes. The parties agreed that the transcripts accurately reflected the words on the tapes, with certain exceptions as to which it was agreed that the transcripts would contain the version believed accurate by each party. The Government agreed with most of the changes sought by defense counsel, and on the most damaging tape, that of the December 29th meeting, agreed to delete certain words and substitute the word "inaudible." An explanation of how the tapes were made was given to the jury, and the tapes and transcripts were admitted; it is undisputed that the tapes played to the jury contained no deletions, splices or additions.

The court having taken these precautions, we hold that it was not an abuse of discretion to admit the tapes and transcripts into evidence nor error to allow the jury to retain the transcripts during the trial and their deliberations. United States v. Koska, 443 F.2d 1167, 1169 (2d Cir.), cert. denied, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971); see United States v. Weiser, 428 F.2d 932, 936–937 (2d Cir. 1969), cert. denied, 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); United States v. Kaufer, 387 F.2d 17, 19 (2d Cir. 1967). We also find that the trial judge's instructions regarding the use of the tapes were proper and hold that appellant's requested instructions correctly were rejected.

Appellant's contentions concerning the propriety of the Government's summation at trial and the involvement of the chief trial prosecutor in the preceding investigation are without merit.

Therefore, the judgment is affirmed.