UNITED STATES of America,
Appellant–Cross–Appellee,

v.

Mario CHALARCA, Defendant–
Appellee–Cross–Appellant.

Nos. 1942, 2085, Dockets 96–1171, 96–1200.

United States Court of Appeals,
Second Circuit.

Sept. 12, 1996.

Daniel C. Becker, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Guy Petrillo, Assistant United States Attorney, of counsel), for Appellant–Cross–Appellee.

Alan E. Kudisch, Kew Gardens, NY, for Defendant–Appellee–Cross–Appellant.

Before: MESKILL and MINER, Circuit Judges, and SCULLIN, District Judge.*

MINER, Circuit Judge:

Appellant-cross-appellee United States of America appeals from the sentence portion, and defendant-appellee-cross-appellant Mario Chalarca cross appeals from the conviction portion, of a judgment of conviction and sentence entered in the United States District Court for the Southern District of New York (Scheindlin, J.). Chalarca was convicted after a jury trial of conspiracy to distribute and possess with intent to distribute cocaine and sentenced principally to a term of imprisonment of thirteen months. The district court sentenced Chalarca in accordance with the relevant conduct Sentencing Guideline applicable to jointly undertaken criminal activity. On appeal, the government contends, as it did below, that the district court should have sentenced Chalarca in accordance with the relevant Guideline applicable to personally undertaken criminal activity. On his cross appeal, Chalarca contends that the district

court erred in receiving in evidence, over his objection, an English-language transcript of a Spanish-language audiotape that had been enhanced by the government. For the reasons that follow, we affirm the judgment of the district court in all respects.

## BACKGROUND

On September 20, 1994, a confidential informant ("CI") of the Drug Enforcement Administration ("DEA") engaged in the first of a series of telephone conversations with Pedro Sanchez. Sanchez had been identified by Alba Ortiz, who was arrested earlier, as the person to whom Ortiz had agreed to sell twelve kilograms of cocaine. In their conversation, the CI told Sanchez that he was working for Ortiz and that Ortiz had asked him to sell the cocaine to Sanchez. The CI and Sanchez agreed to meet, and did meet later that day, at a Wendy's restaurant, Queens Boulevard and 45th Street in the Borough of Queens, New York City.

At the meeting, Sanchez agreed to pay at least $60,000 up front for the cocaine, with the balance to be paid after he sold the drugs. He also told the CI that his cousin would receive the cocaine, and he suggested two alternative procedures for the transaction. His cousin would wait at the bus stop in front of Wendy's, the CI would pick up the cousin in a car, and the exchange of cash for cocaine would take place in the car; or, after the pickup at the bus stop, the cousin would escort the CI to a nearby apartment, where the exchange would take place. Sanchez described his cousin's appearance, and it was agreed that the transaction would be completed within the next day or two so that Sanchez would have time to raise the required funds.

On September 22, 1994, at about 12:15 p.m., Sanchez and the CI engaged in a telephone conversation in which Sanchez advised that he had $70,000 and was ready to conclude the drug transaction at 1:00 in the afternoon. As directed by DEA agents, the CI proposed that the exchange of cash for

---

* The Honorable Frederick J. Scullin, Jr. of the United States District Court of the Northern District of New York, sitting by designation.

cocaine take place in the parking lot of the same Wendy's restaurant where the initial meeting was held. Sanchez refused this proposal, considering it to be too dangerous to conduct such a transaction in so public a place. He insisted that the CI pick up his cousin and proceed to the apartment mentioned in the earlier conversation. In another telephone call a few minutes later, it was agreed that Sanchez would show the CI his cash near Wendy's and that, after the cash was viewed, the exchange would take place at the nearby apartment.

At 11:56 a.m. on September 22nd, Chalarca had signed out of work at his place of employment in New Jersey, although he was scheduled to work until 2:30 p.m. Chalarca drove his jeep to the Wendy's restaurant in Queens, having picked up Sanchez somewhere along the way. He parked on a side street near the restaurant sometime before 1:30 p.m., and Sanchez entered the restaurant to meet the CI. Sanchez, who was related to Chalarca and referred to him as his "cousin," was waiting when the CI arrived. He told the CI that he had the $70,-000, that his cousin was present, and that he had just told his cousin that the CI had changed the conditions for the exchange. Sanchez then led the CI out of the restaurant and across the parking lot to Chalarca's jeep, where Chalarca was sitting in the driver's seat.

Sanchez asked the CI to get into the jeep to view the money, but the CI declined. They then stood next to the open front passenger seat door and leaned into the vehicle. Sanchez asked Chalarca: "Where is the money?" Chalarca purportedly reached into the back seat, took out a small black bag and told the CI to "look at the bag." This statement by Chalarca was subject to some controversy at trial. The conversation during the transaction was conducted in Spanish and tape-recorded by the CI. On two occasions, the interpreter testified that Chalarca said: "that is the bag" or "esa la bolsa" in Spanish but later testified that what Chalarca said was: "look at the bag" or "vea la bolsa" in Spanish. The tape was enhanced by the government. In any event, Sanchez unzipped the bag and took out $70,000 in cash,

which the CI counted in the presence of Chalarca and Sanchez.

As he counted the cash, the CI said, "I will go bring mine," apparently referring to the cocaine. Sanchez then told the CI, that "he," pointing at Chalarca, is "gonna get in with you." Sanchez also said that he was "not gonna do the deal there" and that he "need[ed] to see the work." After a further discussion, Sanchez and the CI walked toward Wendy's, leaving the cash in the jeep with Chalarca. The CI then gave the DEA agents posted in the area a pre-arranged signal, and the arrests were made. The agents found the $70,000 in $100 bills in the jeep.

Although Sanchez and Chalarca were arrested in the Borough of Queens, which is in the Eastern District of New York, they were indicted in the Southern District of New York. The indictment charged them with conspiracy to "distribute and possess with intent to distribute a controlled substance, to wit, five kilograms and more of cocaine, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A)." According to the indictment, the conspiracy occurred "[f]rom in or about September, 1994 through up to and including on or about September 22, 1994, in the Southern District of New York and elsewhere." Various overt acts were alleged to have been committed in furtherance of the conspiracy, only one in the Southern District of New York: "On or about September 19, 1994, a co-conspirator not named as a defendant herein met with an undercover agent in the vicinity of 57th Street and Second Avenue in Manhattan."

Sanchez entered a plea of guilty to the indictment on May 16, 1995. Chalarca opted for a jury trial after entering a plea of not guilty. The trial began on June 6, 1995 and concluded on June 13, 1995, when the jury returned a verdict of guilty. At his sentencing hearing on February 13, 1996, the district court heard the testimony of Chalarca, the testimony of DEA Special Agent David McNamara, one of the arresting officers, and the arguments of counsel. On February 29, 1996, the district court issued an opinion holding that Chalarca's offense level was 12—a level corresponding to a drug quantity

of less than 25 grams of cocaine. The court indicated that a sentence of incarceration within the applicable Guideline range of ten to 16 months would be imposed. The court rejected Chalarca's request for a downward departure based on less than minimal participation, extraordinary family circumstances and lack of proprietary interest in the narcotics or the money.

In its opinion of February 29th, the court noted that the government sought to hold Chalarca liable for the entire 12 kilograms under negotiation, which would call for a mandatory minimum sentence of ten years of imprisonment under 21 U.S.C. § 841(b)(1)(A) (more than five kilograms of cocaine). The court also noted that if Chalarca were found responsible for the amount of cocaine that could be purchased with the $70,000 found in the jeep, he would face a mandatory minimum sentence of five years of imprisonment in accordance with 21 U.S.C. § 841(b)(1)(B) (more than 500 grams of cocaine). The district court determined that Chalarca had no knowledge of any particular quantity of cocaine and that no particular quantity was foreseeable to him. Accordingly, the court fixed Chalarca's offense level at the level representing the least amount of cocaine that appears in the Drug Quantity Table in the Sentencing Guidelines.

In arriving at its conclusion, the district court applied the Sentencing Guideline applicable to jointly undertaken criminal activity, observing that the defendant was found guilty only of conspiracy. According to the Guidelines, a defendant's offense conduct is determined on the basis of the reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. The court accepted Chalarca's contention that the 12 kilograms of cocaine that Sanchez was attempting to purchase were not foreseeable to him. The court also accepted Chalarca's contention that he could not foresee the amount of cocaine that could be purchased for $70,000. Sanchez had made some statements indicating that Chalarca knew nothing about the transaction with the CI, and the district court found that "[t]hese statements have the ring of truth."

The following findings are set forth in the decision of February 29th:

> Assuming, as I must, that Chalarca conspired with his cousin to purchase a quantity of drugs, there is simply no credible evidence that he was aware of or participated in any discussions regarding the amount. There is no evidence that Chalarca discussed the quantity of drugs with Sanchez or the CI. In addition, I specifically credit Chalarca's testimony at both the trial and the sentencing hearing that he did not know the terms of the transaction. There is no evidence that he ever saw any drugs or had anything to do with raising the money to purchase the drugs. While he did see the money minutes before the arrest, this does not mean that he knew what drug or what quantity of drugs the money would be used to purchase.

(Footnote and citations omitted).

The government thereupon moved for reconsideration of the court's opinion of February 29th, arguing, apparently for the first time, that sentence should have been imposed under the Sentencing Guideline applicable to personally undertaken criminal conduct rather than under the Guideline applicable to jointly undertaken conduct. After consideration of the arguments raised by the government, the court issued an opinion dated March 13, 1996 adhering to its previous conclusion and again "find[ing] that there is no quantity of drugs of which defendant Chalarca knew or could reasonably have foreseen." In rejecting the government's contention that the individual acts Guideline should apply (in which case Chalarca would be sentenced on the basis of the entire amount of cocaine under negotiation), the district court found that "Chalarca committed no acts (other than the act of conspiracy) for which he could be sentenced." The court stated:

> As recounted in the February 29 Opinion, there is no evidence that Chalarca participated in any negotiations, met with any seller, saw or handled any drugs, or indeed engaged in any conspiratorial conversations with Sanchez. In fact, Chalarca's coconspirator has stated for over a year, at great risk to his own sentencing prospects,

that Chalarca knew nothing about the deal. Chalarca has no prior criminal record, has held a low-level job as a hospital custodian for eight years, is married and the father of three children, and has no unexplained wealth.

The district court specifically expressed skepticism about the interpreter's testimony regarding the statement purportedly made by Chalarca at the scene, stating: "Even upon playing the [enhanced] tape repeatedly, I still heard nothing that would suggest that a third person spoke during the conversation between Sanchez and the CI."

On March 18, 1996, the district court sentenced Chalarca to a term of imprisonment of 13 months, a term of supervised release of three years and a mandatory assessment. Chalarca has served his term of imprisonment and has been released.

## DISCUSSION

According to U.S.S.G. § 1B1.3(a), relevant conduct for sentencing purposes is assessed on the basis of

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

In the case of controlled substances, a defendant is accountable only for quantities "with which he was directly involved" and, as to jointly undertaken criminal activity, only for "reasonably foreseeable quantities" within the scope of that activity. U.S.S.G. § 1B1.3, comment. (n. 2). The reasonable foreseeability requirement applies only to the conduct of others; it "does not apply to conduct that the defendant personally undertakes." *Id.* For example, one who was convicted of importing heroin "was properly sentenced for the total amount of heroin in her possession, without regard to whether she knew or could foresee the heroin concealed in her shoes." *United States v. de Velasquez*, 28 F.3d 2, 6 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 679, 130 L.Ed.2d 611 (1994).

The fact that one is convicted of conspiracy to distribute narcotics does not necessarily call for the application of the jointly undertaken criminal activity Guidelines. Under subsection (1)(A), a defendant who is a party to such a conspiracy is accountable for the quantities of narcotics in which he had a direct, personal involvement. That is because this Guideline, applicable to personally undertaken criminal activity, covers all acts committed by a defendant "that occurred during the commission of the offense of conviction." § 1B1.3(a)(1). A conspiracy "is a continuing crime that 'endures until its objectives are either completed or abandoned.'" *United States v. Wong*, 40 F.3d 1347, 1366 (2d Cir.1994) (quoting *United States v. Lovell*, 16 F.3d 494, 497 (2d Cir.1994)), *cert. denied*, —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995).

We therefore agree with the government that the quantity of drugs attributed to a defendant need not be foreseeable to him when he personally participates, in a direct way, in a jointly undertaken drug transaction. This was the case in *United States v. Lockhart*, 37 F.3d 1451 (10th Cir.1994), an opinion relied upon by the government. There, the defendant had driven his co-conspirator to a restaurant that was the site of a controlled delivery of cocaine. The co-conspirator entered the restaurant, took possession of the cocaine and returned to the car with the drugs. The arrests were made as he returned. Defendant pled guilty to conspiracy to possess with intent to distribute cocaine. The Tenth Circuit determined that defendant had participated personally in the transaction and that the foreseeability of the quantity involved therefore was irrelevant. *Id.* at 1454. The court specifically found that

"[d]efendant knew that the purpose of the trip was to obtain cocaine." *Id.*

To the same effect is *United States v. Corral–Ibarra,* 25 F.3d 430 (7th Cir.1994), also cited by the government. In that case, a defendant named Herrera was said to have underestimated the amount of the cocaine involved in the transaction that led to his conviction for conspiracy to distribute cocaine and attempted possession with intent to distribute. Herrera was hired to test the cocaine, and the court was convinced "that Herrera underestimated the full scope of the deal, perhaps by a factor of ten or more." *Id.* at 437–38. Nevertheless, the court found legally irrelevant the quantity of drugs reasonably foreseeable to the defendant because of the extent of his personal involvement. The court observed that "the critical distinction is between direct and remote involvement in an illegal activity because only the latter will trigger a reasonable foreseeability inquiry." *Id.* at 438. The court concluded that "Herrera played a direct, personal role in furtherance of the attempt to obtain and distribute a large quantity of cocaine." *Id.*

■ While we have no problem with accepting the government's contention that a defendant under certain circumstances may be sentenced for personally undertaken criminal activity where he is charged only with jointly undertaken criminal activity, the findings of the trial court make such a disposition inappropriate in the case before us. The district court determined as a factual matter that, although Chalarca was at the scene of a drug transaction that was in progress between Sanchez and the CI on September 22nd, he had no knowledge of what was taking place there. The court accepted the statements of Sanchez that Chalarca knew nothing about the transaction and accepted Chalarca's testimony at the sentencing hearing to the same effect. The district court heard nothing on the tape to suggest that Chalarca made *any* comments regarding the bag containing the money, and concluded that Chalarca did not see the money until "minutes" before the arrest was made. In assessing Chalarca's credibility, the district court took into consideration the fact that he had no prior record, had worked as a hospital custodian for eight years, was married with three children and had no unexplained wealth.

■ In applying the Sentencing Guidelines, we have no alternative but to accept the district court's findings of fact unless they are clearly erroneous. 18 U.S.C. § 3742(e); *see also United States v. Davis,* 967 F.2d 84, 88–89 (2d Cir.), *cert. denied,* 506 U.S. 928, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992). We are mindful of the great deference to be afforded to the factual findings of the district court and of the admonition of the Supreme Court that the "[clearly erroneous] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Indeed, we may very well have decided this case differently, for it is difficult to accept the proposition that Chalarca was at the transaction scene without knowledge or personal involvement. Yet, we cannot say on the entire evidence that we are "left with the definite and firm conviction that a mistake has been committed" by the district court. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. There were two permissible views of the evidence in Chalarca's case, and we simply cannot say that the district court's choice between them amounted to clear error.

Because the involvement of Chalarca was not direct, as was the case in *Corral–Ibarra,* and because Chalarca was not aware that the purpose of his trip to the scene was to purchase cocaine, as was the case in *Lockhart,* and because he did not constructively possess drugs or actually possess them as was the case in *de Velasquez,* he cannot be sentenced under subsection (1)(A) for criminal activity personally undertaken. The district court, based on its findings, was required to and did sentence Chalarca under the provisions of subsection (1)(B) for the jointly undertaken

criminal activity for which he was convicted. In applying this Guideline, the court was constrained to determine the quantity of cocaine reasonably to be foreseen "within the scope of the criminal activity that he jointly undertook." § 1B1.3, comment. (n. 2). In a case decided in the context of former U.S.S.G. § 2D1.4,[1] we made the following observation in this regard:

> It is not required to find that appellant had knowledge of the exact quantity of narcotics involved in the conspiracy so long as— in considering defendant's role in the narcotics part of the charged conspiracy—the district court determines that it is convinced by a preponderance of the evidence that defendant knew or could reasonably have foreseen the quantity of drugs involved in the conspiracy.

*United States v. Cardenas,* 917 F.2d 683, 687 (2d Cir.1990).

▪ The district court found that Chalarca had no knowledge of any particular quantity of cocaine and that no particular quantity was foreseeable to him in connection with the conspiracy of which he was a member. Here too we are bound by the district court's factual findings. The government contends that the jury's verdict "necessarily means" that Chalarca's conduct at the scene made him a knowing participant and that "[h]is knowledge that $70,000 was shown to the CI necessarily implies that the quantity of drugs purchasable with $70,000 was, at a minimum, foreseeable." This, of course, is contrary to the district court's findings that Chalarca knew nothing of the money until "minutes" before his arrest and that he had no idea how much cocaine the money would buy in any event.

Although the government argues that the district court's findings in regard to foreseeability are clearly erroneous and impermissibly contradict the jury's verdict, we are not persuaded by this argument. In order for the jury to convict, it needed only to find beyond a reasonable doubt that Chalarca entered into an agreement with Sanchez to distribute and possess with intent to distribute cocaine. It was not necessary to prove the commission of any overt acts in furtherance of the conspiracy. *See United States v. Shabani,* — U.S. —, —, 115 S.Ct. 382, 385, 130 L.Ed.2d 225 (1994). It is noteworthy that the indictment charges that the conspiracy was alleged to have occurred "in the Southern District of New York and elsewhere." Indeed, it was necessary for the government to establish only that the crime, or some part of it, occurred in the Southern District in order to have venue there. *See United States v. Naranjo,* 14 F.3d 145, 147 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994).

There was sufficient evidence to have permitted the jury to conclude that the conspiratorial agreement was formulated in the Southern District, and it was not necessary for the jury to find that Chalarca had any knowledge of the particular transaction that occurred on September 22nd in order to convict him of the crime with which he was charged. *See United States v. Ramirez–Amaya,* 812 F.2d 813, 816 (2d Cir.1987) ("As to a charge of conspiracy, venue may properly be laid in the district in which the conspiratorial agreement was formed. . . .").

Chalarca's mere presence at the scene was not enough to fulfill the foreseeability requirement, and the factual findings of the district court as to this requirement do not amount to clear error. It is less difficult for us to accept the district court's findings in this regard than it was for us to accept the district court's findings of lack of personal involvement. It seems to us that Chalarca was totally lacking in any knowledge of the cocaine trade and would have had no idea how much cocaine could be purchased for $70,000, even if he had earlier knowledge that $70,000 was involved. We have no problem accepting the district court's finding that Chalarca did not know how much cocaine was the subject of the conspiratorial agreement. Accordingly, we find no error in the district court's imposition of a sentence based upon

---

1. Section 2D1.4 (1990) provided that the base offense level in an inchoate controlled substance offense "shall be the same as if the object of the conspiracy or attempt had been completed." This provision was deleted by consolidation with the Guidelines applicable to the underlying substantive offenses, effective November 1, 1992. § 2D1.4 [Deleted] (1995).

the least amount of cocaine that appears in the Sentencing Guidelines Drug Quantity Table.

■ The cross appeal need not detain us long. Chalarca argues for reversal of his conviction on the ground that the district court erred in admitting into evidence an English language transcript of a Spanish language audiotape of the conversation between Sanchez and the CI at the scene of the transaction. The government used an audio technician to enhance the tape through a process that minimized background noise. The recorded conversation then was transcribed into English by a court-certified interpreter. The transcript attributed to Chalarca the words "vea la bolsa" or "look at the bag," the same phrase that the district court was unable to discern.

At trial, Chalarca moved to preclude the government from including the statement in the transcript, contending that the statement could not be heard without enhancement, and that there was no witness to testify that Chalarca in fact said anything. The district court held a hearing on the motion and ruled the statement admissible, holding that Chalarca could offer an alternative transcript without the disputed phrase. In addition, the district court charged the jury that, as "the ultimate fact finder[ ]," it could accept or reject the testimony of the interpreter and "accept or reject this transcript or any portion of this transcript of the Spanish conversation."

■ The decision to receive in evidence English translations of foreign-language transcripts lies in the discretion of the district court. *See United States v. Font–Ramirez*, 944 F.2d 42, 48–49 (1st Cir.1991), *cert. denied*, 502 U.S. 1065, 112 S.Ct. 954, 117 L.Ed.2d 122 (1992). Moreover, when litigants disagree as to the precise words on a tape, or as to the accuracy of transcripts, the district court may permit each party to submit an alternative transcript to the jury. *See, e.g., United States v. Carson*, 464 F.2d 424, 437 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *see also United States v. Chiarizio*, 525 F.2d 289, 293 (2d Cir.1975) ("In cases where the defense and prosecution disagree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions."). A limiting instruction by the district court concerning the use of transcripts, which includes an instruction that the jury is the ultimate factfinder, should alleviate any prejudice arising from the introduction of the transcripts. *See United States v. Nixon*, 918 F.2d 895, 901–02 (11th Cir.1990); *see also United States v. Bryant*, 480 F.2d 785, 791 (2d Cir.1973).

The district court did not abuse its discretion in receiving the transcript in evidence. The district court afforded Chalarca an opportunity (which he did not accept) to offer in evidence an alternative transcript without the disputed phrase. Finally, the district court clearly instructed the jury that it was the factfinder on this issue and as such could accept or reject the transcript that was received in evidence. The court's "cautionary instructions eliminated whatever harmful effect that might otherwise have resulted from any discrepancies between the tape and the transcript." *Bryant*, 480 F.2d at 791.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in all respects.

SCULLIN, District Judge, Concurring:

While I fully concur in this Court's decision to affirm the District Court in its application of the sentencing guidelines, I would do so without reservation. Under the circumstances of this case, I do not find it as difficult as the majority to conclude that no specific quantity of cocaine can be attributed to defendant Chalarca. In convicting Chalarca of conspiracy the jury made no specific determination as to the quantity of drugs involved,[1] and on the record before us it is

---

1. Chalarca was found guilty after trial of conspiracy to distribute and to possess with intent to distribute cocaine. In her charge to the jury, the District Court Judge appropriately instructed that:

> [t]he conspiracy count charges that the narcotics involved here were cocaine. In this regard,

clear that drugs were never present.[2] The District Court also found, after an extensive hearing, that Chalarca had no knowledge of the amount of drugs involved in the negotiations between his co-conspirators and the government agents, or the amount of drugs that $70,000 could buy.[3] The District Court applied the criteria set forth in 1B1.3(a)(1)(B) to those findings to determine the appropriate amount of cocaine to attribute to Chalarca.

The majority affirms this application of 1B1.3(a)(1)(B) on the finding of the District Court that Chalarca lacked knowledge of the purpose of the trip to Queens and therefore he could not be considered to be "personally involved" so as to bring him within the ambit of 1B1.3(a)(1)(A). I do not disagree with the majority's reasoning, however, I would not find it necessary to attribute any specific amount of cocaine to Chalarca even if he had been personally involved in facilitating the aborted drug transaction. Neither the defendant or his co-conspirator were charged with possession, nor were there any drugs present that could be possessed. None of the cases cited by the majority in discussing U.S.S.G. § 1B1.3(a)(1)(A) attribute a specific quantity of drugs to a defendant convicted solely of conspiracy where no drugs were present. Some quantity was present in all three cases. *See United States v. de Velasquez*, 28 F.3d 2 (2d Cir.), *cert. denied*, ––– U.S. –––, 115 S.Ct. 679, 130 L.Ed.2d 611 (1994) (defendant convicted of importation and 804.1 grams of heroin present); *United States v. Corral–Ibarra*, 25 F.3d 430 (7th Cir.1994) (defendant convicted of conspiracy to distribute and attempted possession with intent to distribute, and 50 kilos of cocaine

present); *United States v. Lockhart*, 37 F.3d 1451 (10th Cir.1994) (defendant convicted of conspiracy to possess with intent to distribute a controlled substance, and 1.5 kilos of cocaine present); *see also United States v. Cardenas*, 917 F.2d 683 (2d Cir.1990) (defendant was convicted of conspiracy to distribute and sentenced pursuant to former U.S.S.G. § 2D1.4 using 60 kilos of cocaine which were actually present during the course of the conspiracy).

On the facts of this case, even if Chalarca knew that he was driving his co-conspirator to a drug transaction, thereby implicating U.S.S.G. § 1B1.3(a)(1)(A), the only crime he could have facilitated was the crime of conspiracy. The District Court, therefore, had discretion to ascertain what was "reasonably foreseeable" to Chalarca in light of his participation, or facilitation, of the conspiracy. It was within the District Court's discretion to decline the government's invitation to attribute to the defendant the quantity of drugs his co-conspirator, Mr. Sanchez, intended to sell over the course of the conspiracy, or the amount of drugs $70,000 could buy. Furthermore, whether it applied U.S.S.G. §§ 1B1.3(a)(1)(A) or 1B1.3(a)(1)(B), it was entirely proper for the District Court to attribute to the defendant the least amount of cocaine on the Drug Quantity Table. Insofar as the majority opinion suggests otherwise, I would respectfully disagree.

---

let me instruct you that the actual quantity of narcotics involved is not an element of this crime, so you need not be concerned with that. You need only find that the co-conspirators agreed to distribute or possess with intent to distribute any quantity of narcotics.

2. This case involves a classic "reverse sting" operation where a government agent agrees to provide a quantity of drugs for an agreed upon price. Thereafter, when the conspirators arrive at the place designated to complete the transaction they are arrested. As is often the case, the government agents here did not have any drugs in their possession.

3. The District Court found that Chalarca had demonstrated, by a preponderance of the credible evidence, that he had no actual knowledge of the quantity of narcotics involved in the conspiracy, and that he could not have reasonably foreseen the quantity involved. For example, Judge Scheindlin found that there was no evidence that Chalarca participated in any discussions regarding the amount of drugs, that he knew the terms of the transaction, that he saw any drugs, or that he had anything to do with raising the money to purchase the drugs. The District Court also credited Mr. Sanchez's testimony, which was against his self-interest, that Chalarca was not involved in the drug deal.