UNITED STATES of America,

v.

Jose SANTIAGO, et al., Defendants.

No. 00 CR. 237(VM).

United States District Court,
S.D. New York.

June 3, 2002.

Aitan D. Goelman, Assistant U.S. Atty., Mary Jo White, U.S. Atty., New York City, for U.S.

Gary S. Villanueva, Ricco & Villanueva, New York City, for defendant.

**DECISION AND ORDER**

MARRERO, District Judge.

After a two-month jury trial, defendants Jose Santiago (hereinafter "Santiago") and Julius Williams (hereinafter "Williams") were convicted of several offenses arising out of their participation in a criminal enterprise that the Government referred to as "Thief David's Crew." More specifically, Santiago was convicted of three counts and Williams of two counts of a nine-count indictment. With respect to the remaining counts against defendants Santiago and Williams, as well as all counts against defendant Adrian Agostini (hereinafter "Agostini"), the jury was unable to reach a unanimous verdict. At the close of the Government's case-in-chief on February 20, 2002, each defendant moved the Court, pursuant to Rule 29 of the Federal Rules of Criminal Procedure (hereinafter "Rule 29"), for a judgment of acquittal on the respective counts charged against him. Each motion was based on an alleged insufficiency of evidence. The Court reserved decision on the motions pursuant to Rule 29(b). For the reasons discussed below, the motions are denied in part and granted in part.

## I. INTRODUCTION

### A. FACTUAL BACKGROUND

According to the evidence presented at trial, from some time in 1994 through March of 2000, Santiago, a/k/a "Thief David," Williams, a/k/a "Stinker," and others were members of a drug gang operating on East 137th Street between Brook and Saint Anns Avenues in the Bronx, New York.[1] As the leader of the gang,

---

1. This particular section of 137th Street is referred to herein as "137th Street," "Santia-

go's Block," or "the Block." The Block included several buildings within the Milbrook

Santiago supervised a number of managers and "pitchers," who were responsible for hand-to-hand narcotics transactions on the Block. Those who wished to sell narcotics on Santiago's Block were required to pay him "rent," unless they were members of his gang. Williams and others were the gang's "enforcers," who used violence to protect the gang's narcotics business, collect debts and punish gang members who lost the gang's money or drugs. Other members of the gang routinely carried and used a variety of guns to protect themselves and to maintain control of the narcotics business on the Block. At some point, Santiago, assisted by members of his gang, rented out a space in a building located near 153rd Street and Elton Avenue in the Bronx for the purpose of organizing a nightclub called "The Loft." Santiago and members of the gang used The Loft to earn money and to make connections with other drug dealers. Members of the gang often brought guns to The Loft and other nightclubs to protect themselves in case any conflict arose with other gangs.

Evidence of various acts of violence charged against members of Santiago's gang were presented at trial. For example, on February 3, 1998, a drug addict named Alan McLeod (hereinafter "McLeod") was stabbed to death in front of 600 East 137th Street in the Bronx, New York; on April 19, 1998, Francisco Martinez (hereinafter "Martinez") was shot after a fight broke out at The Loft; and on March 18, 2000 Paul Crowder was slashed with knives in the vestibule of the building at 575 East 140th Street in the Bronx. These acts, as discussed below, figure prominently in a number of crimes for which the three defendants were in-dicted and in the grounds they assert in support of their respective Rule 29 motions.

## B. *LEGAL STANDARD*

Under Federal Rule of Criminal Procedure 29, a Court "shall order the entry of judgment of acquittal … if the evidence is insufficient to sustain a conviction of [any charged] offense or offenses." Fed.R.Crim.P. 29(a). In considering such a motion, the Court must decide, based on all of the relevant evidence, whether a rational juror "might fairly conclude guilt beyond a reasonable doubt." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972)); *accord United States v. Bloome*, 784 F.Supp. 23, 25 (E.D.N.Y.1992). A Court must draw all reasonable inferences in favor of the Government, *see Mariani*, 725 F.2d at 865, and all issues of credibility in favor of the jury's verdict. *See United States v. Weiss*, 930 F.2d 185, 191 (2d Cir.1991); *United States v. Roldan–Zapata*, 916 F.2d 795, 802 (2d Cir.1990).

A defendant "challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir.1992). He or she must establish that, "viewing the evidence in the light most favorable to the government, … no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir.), *cert. denied*, 520 U.S. 1220, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997) (quoting *United States v. Taylor*, 92 F.3d 1313, 1333 (2d Cir.1996)).

---

Houses (hereinafter the "Milbrook Houses"), a public housing development of the New York City Housing authority where Santiago and other gang members lived and operated their drug trade.

## II. *CLAIMS BY JULIUS WILLIAMS*

Williams was charged in Counts One, Two, Three, Four, Five, Seven and Eight. Count One charged that Williams, Santiago and others participated in the operation and management of Thief David's Crew through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962 (hereinafter the "RICO statute"). Williams's pattern of racketeering activity allegedly consisted of his participation in at least two of three charged racketeering acts: (1) a narcotics conspiracy from 1994 through March 2000 to distribute and possess with intent to distribute crack cocaine, heroin, and marijuana; (2) the murder of McLeod on February 3, 1998; and (3) the attempted murder of Martinez on April 19, 1998. Count One also charged that Williams participated in and, as a manager of the enterprise, directed others to carry out unlawful activities in furtherance of the conduct of the enterprise's affairs.

■ To prove that Williams was guilty of violating the RICO statute, the Government was required to establish five elements beyond a reasonable doubt: first, that the criminal enterprise set out in the Indictment existed; second, that Williams was associated with or employed by the enterprise; third, that Williams engaged in a pattern of racketeering activity; fourth, that Williams unlawfully, willfully, and knowingly conducted or participated in the conduct of the affairs of that enterprise through that pattern of racketeering activity; and fifth, that the enterprise affected interstate or foreign commerce. *See United States v. Indelicato*, 865 F.2d 1370, 1373 (2d Cir.1989) (*en banc*). Williams asserts that there was insufficient evidence for a rational juror to conclude that the second, third and fourth elements existed.

Specifically he asserts that the evidence neither established that he was part of the RICO enterprise, nor that he was involved in the operation and management of the enterprise. In addition, Williams asserts that there was insufficient evidence for a rational juror to conclude that he had engaged in a pattern of racketeering activity. He argues that there was inadequate proof with respect to the murder alleged in Racketeering Act Three and the attempted murder alleged in Racketeering Act Four. Finally, Williams argues that even if there was sufficient evidence for a rational juror to conclude that he committed the alleged murder and attempted murder, there was insufficient evidence that he conducted or participated in the conduct of the affairs of the enterprise through those acts.

■ As an initial matter, the Court finds no merit in Williams's claim that he was not a member of Thief David's Crew. During the course of the trial, there was ample evidence that Williams not only sold drugs for Santiago, but that he also served as one of Santiago's enforcers, carrying out discipline in the enterprise and protecting its drug operations from other gangs. At trial, Eric Cabrera (hereinafter "Cabrera") testified that in late 1997, Williams supplied him with crack to sell on several occasions. (Trial Tr. at 768.) Cabrera sold crack on the Block and returned the money from the sales to Williams. (Trial Tr. at 768, 809.) In return, Williams gave Cabrera a twenty percent commission. (*Id.*)

Michael Cofield (hereinafter "Cofield") testified that at some point after he moved to the Milbrook Houses in September 1997, he started selling narcotics for Santiago. (Trial Tr. at 2422, 2425.) Cofield further testified that he and Williams sometimes sold heroin together for Santiago. (*Id.*) Aside from selling narcotics, Williams had another role as an "enforcer" of the enterprise. If any of Santiago's sellers could not account for all of their money from narcotics sales, Williams

would "come and get it" and if any member of the enterprise was robbed, Williams would "go take care of it." (*Id.*) According to Cofield, Williams "didn't like to play, he was serious a lot." (Trial Tr. at 2429.) Williams's reputation in the enterprise was that he was "[a] guy not to be messed with." (*Id.*) On a few occasions, Lawrence Cherry (hereinafter "Cherry"), one of the members of Thief David's Crew, was "short" on the amount of money that he owed Santiago after selling Santiago's narcotics. (Trial Tr. at 2427.) Cherry told Cofield that he was afraid that if he did not provide Santiago with the money he "might get hurt" by Williams or the other "enforcers" of the enterprise. (*Id.*) In addition to his "enforcer" role, Williams worked for Santiago as a security guard at The Loft. (Trial Tr. at 2428.)

These facts were more than sufficient for a rational juror to conclude that Williams was associated with Thief David's Crew and that he had some part in conducting the affairs of the enterprise. *See Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ("In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's

affairs is required."); *see also De Falco v. Bernas,* 244 F.3d 286, 310–11 (2d Cir.2001).

With respect to the third and fourth elements of Count One, Williams makes two related arguments: first, that there was insufficient evidence that he engaged in a pattern of racketeering activity; and second, that even if there was evidence that he did commit certain acts, there was insufficient evidence that he knowingly participated in the conduct of the affairs of Thief David's Crew through that pattern of racketeering activity. (Trial Tr. at 4507–09.) Both arguments are unavailing. However, based on the evidence presented at trial, the Court finds that a rational juror could have reasonably concluded that Williams: (1) engaged in a pattern of racketeering activity by murdering McLeod and attempting to murder Martinez; and (2) knowingly participated in the conduct of the affairs of Thief David's Crew through that pattern of racketeering activity.[2]

## A. *MURDER OF ALAN MCLEOD*

■ Counts Five and Seven and Racketeering Act Three of Count One charge that Williams violated a number of statutes by murdering Alan McLeod. Williams asserts that there was insufficient evidence that he committed the murder of McLeod. In the alternative, he contends that there was no evidence that the alleged murder was connected to the affairs of Thief David's Crew. The Court disagrees and finds that there was ample evidence at trial that Williams murdered McLeod in

---

**2.** In his Rule 29 motion on Count Two, Williams essentially relied on the arguments that he made with respect to his Rule 29 motion on Count One. Based on the evidence discussed below, as well as other evidence presented at trial, the Court concludes that a rational juror could have reasonably found that: (1) Thief David's Crew was a racketeer-ing enterprise, within the meaning of 18 U.S.C. § 1961; (2) Williams was employed by or associated with the enterprise; (3) Williams unlawfully, willfully, and knowingly conspired with others to participate in the conduct of the affairs of that enterprise; and (4) the enterprise affected interstate or foreign commerce.

connection with his role as an "enforcer" of Thief David's Crew.

### 1. *Factual Background*

On February 3, 1998, Cabrera, Cofield, Cherry, Ortiz and Juaqin Diaz (hereinafter "Diaz") were standing in front of the building at 600 East 137th Street "hanging out" and smoking marijuana. (Trial Tr. at 1226.) Some time between 1:30 and 2 a.m., McLeod came out of the building at 600 East 137th Street and asked them if they had any money. (Trial Tr. at 777.) Ortiz described McLeod as a "drug addict" (Trail Tr. at 1224), and Cofield described him as a "crack head." (Trial Tr. at 2429.) According to Cabrera and Ortiz, a few minutes later, they saw Williams approaching them. (Trial Tr. 777, 1227.)

Williams asked McLeod if he had the money that he owed Williams. (Trial Tr. at 778.) McLeod told Williams that he was going to get it. (Trial Tr. at 779.) Williams approached Cabrera and told him, "I'm going to give him a pack, and when he finishes, get the money for me." (Trial Tr. at 780.) Cabrera testified that he understood a "pack" to mean a "bundle" of crack cocaine. (*Id.*) Cabrera also testified that McLeod owed Williams one hundred dollars for taking crack cocaine from Williams on other occasions. (*Id.*) Williams approached McLeod and "punched" him in the stomach. (Trial Tr. at 781.) Cabrera testified that he later discovered that what he had thought was a "punch" was in fact, a knife stabbing. (Trial Tr. at 782.) McLeod ran into a nearby grassy area and Williams followed him and stabbed him twice in the lower part of his neck and upper back. (*Id.*) Enoch Cherry testified that he heard Williams say, "next time, pay me my money," as Williams stabbed McLeod. (Trial Tr. at 1119.)

After stabbing McLeod, Williams told Cabrera, Cofield, Ortiz, Enoch Cherry and Diaz to leave. They went inside the lobby of 600 East 137th Street but waited to see if McLeod would get up. After approximately one minute, they came back out of the building and Williams saw them. (Trial Tr. at 790.) Williams told them all to leave and signaled that McLeod was dead, drawing his hand across his throat. (Trial Tr. at 791.) Everyone left the area and at some point, the police arrived and secured the crime scene. At 3:26 a.m., a medical legal investigator named Craig Angard (hereinafter "Angard"), received a call that there had been a homicide in front of 600 East 137th Street and he reported to the scene approximately thirty minutes later. (Trial Tr. at 1278.) Angard discovered a stab wound on the back of McLeod's neck and found another stab wound in McLeod's chest. (*Id.*) There was a large amount of blood around McLeod's chest area.

Implicitly acknowledging the weight of the evidence that he murdered McLeod, Williams asserts that "there is no evidence to suggest that [he] did [the murder] than out of either personal pique or out of the fact that ... he believed that McLeod owed him somewhere in excess of $10." (Trial Tr. at 4509.) As with his argument that there was insufficient evidence of his membership in the enterprise, the Court finds this argument to be meritless.

As discussed above, there was sufficient evidence for a rational juror to conclude that Williams was a member of Thief David's Crew and that he was selling narcotics for Santiago during the period charged in the Indictment. At trial, New York City police detective Robert Richardson (hereinafter "Richardson") testified that on October 28, 1997, while acting in an undercover capacity, he purchased crack cocaine from Williams on East

137th Street, between St. Anns and Brook Avenues. (Trial Tr. at 444–46.) Richardson approached Williams, who was standing alone in front of a Milbrook Houses building located at 530 East 137th Street. (*Id.*) Richardson handed Williams twenty dollars in cash, whose serial numbers had been pre-recorded, and received four ziplock bags containing crack cocaine. (*Id.*) This incident is significant because it demonstrates that Williams was selling small bags of crack cocaine on the Block, approximately three months before he allegedly murdered McLeod. In addition, Natasha LaPlaza, who was Williams's girlfriend around this time, testified that on one occasion she saw Santiago give Williams a clear sandwich bag with a hard white substance that looked like crack cocaine. (Trial Tr. at 1427.) She also saw Williams open up the back of a teddy bear that he had in his room and put the bag inside. (Trial Tr. at 1428.)

The foregoing evidence could have reasonably supported a conclusion that: (1) Williams was selling crack cocaine for Santiago in February 1998; (2) Williams's role in Thief David's Crew was to maintain discipline, collect money and prevent robberies through intimidation and acts of violence; (3) McLeod owed Williams $100 for crack cocaine that he had taken from Williams for consumption; (4) McLeod was frightened and was asking other people for money on February 3, 1998; and (5) Williams killed McLeod because of his failure to pay Williams this debt. Williams's argument that he may have killed McLeod due to some "personal pique" or a "$10 debt" is not only unlikely, it is completely contrary to the evidence presented at trial, including but not limited to, the testimony of LaPlaza, Cabrera, Cofield and Ortiz. Such evidence was sufficient for a rational juror to conclude that Williams murdered McLeod in connection with his role in Thief David's Crew, as alleged in Racketeering Act Three.

Similar reasoning applies to Counts Five and Seven. Count Five and Racketeering Act Three are almost identical, in that they both allege that Williams murdered McLeod in connection with his role in Thief David's Crew. Racketeering Act Three alleges that Williams murdered McLeod while he was conducting the affairs of Thief David's Crew and Count Five alleges that he committed the murder "for the purpose of gaining entrance to and maintaining and increasing his position in Thief David's Crew," in violation of 18 U.S.C. § 1959 (hereinafter " § 1959"). (Indictment ¶ 25.) With respect to Williams's Rule 29 motions, these separate allegations present a distinction without a difference. There was ample evidence for a rational juror to conclude that Williams killed McLeod to maintain his role in Thief David's Crew as an "enforcer" and that the murder was connected to his participation and conduct in the enterprise for the same reason. *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir.1992); *see also Untied States v. Tipton*, 90 F.3d 861, 891 (4th Cir.1996) (holding that defendants had killed others for the purpose of maintaining their membership in a RICO enterprise).

■ Count Seven is slightly different, in that it alleges that Williams murdered McLeod while he was "engaged in an offense punishable under Section 841(b)(1)(A) of Title 21, United States Code." (Indictment ¶ 28.) To prove Williams guilty of Count Seven, the Government was required to establish that: (1) Williams was guilty of a narcotics conspiracy; (2) the drug conspiracy involved at least 50 grams of crack cocaine, or one kilogram or more of heroin; (3) while engaging in such a drug conspiracy, Williams intentionally killed Alan McLeod or counseled, induced, procured, or caused the

intentional killing of Alan McLeod; and (4) the killing of Alan McLeod actually resulted from the actions of Williams. *See United States v. Walker*, 142 F.3d 103, 113 (2d Cir.1998). Based on the evidence discussed above, the Court finds that there was sufficient evidence for a rational juror to convict Williams on Count Seven. The testimony of LaPlaza, Cofield, and Cabrera could have reasonably supported inferences that Williams was a member of a drug conspiracy that involved at least 50 grams of crack cocaine, or one kilogram or more of heroin and that while engaging in such drug conspiracy, Williams intentionally killed Alan McLeod.

### B. *ATTEMPTED MURDER OF FRANCISCO MARTINEZ*

Count Four and Racketeering Act Four of Count One both allege that on April 19, 1998, Williams, Jose Baerga (hereinafter "Baerga"), and others attempted to murder Martinez in the vicinity of 3rd Avenue and East 155th Street in the Bronx, New York. Count One alleges that Racketeering Act Four was part of a pattern of racketeering activity through which Williams participated in the conduct of the affairs of Thief David's Crew. Count Four alleges that Williams committed the attempted murder of Martinez for the purpose of gaining entrance to or maintaining and increasing his position in Thief David's Crew, in violation of 18 U.S.C. § 1959.

#### 1. *Factual Background*

##### a. *Connection of The Loft to Thief David's Crew*

In February 1998, Santiago and members of his enterprise ran The Loft as an after-hours club. (Trial Tr. at 2048, 2453–54, 2865.) The Government contends, and the evidence at trial could support a reasonable inference, that the management and operation of The Loft was connected to the narcotics conspiracy charged in Racketeering Act One. *See* 18 U.S.C. § 1961(1). Cofield and other witnesses testified that The Loft was on one floor and a separate nightclub, called "Club X," was located on a different floor of the same building. (Trial Tr. at 2453–54.) Cofield gave out promotional cards advertising The Loft and other members of Thief David's Crew worked as security at The Loft, including, Williams, Jesus Rivera (hereinafter "Rivera"), Baerga and other members of the "the Cypress Milbrook Boys." The "Cypress Milbrook Boys," also known as the "CMB," were the "older guys" in Santiago's enterprise. (Trial Tr. at 2423.) The group included Santiago, Williams, Rivera, and two other individuals nicknamed "Bill Blass" and "Macho." (*Id.*) The evidence presented at trial could have reasonably supported an inference that the CMB was a sub-group of Thief David's Crew that sold narcotics for Santiago and committed acts of violence to protect the business and affairs of the enterprise.[3] The Loft's security staff wore leather jackets with markings of their names on the front and the words "The Loft" on the back. (Trial Tr. at 2456.)

Rodriguez testified that there were certain advantages to running a nightclub, as opposed to simply attending. (Trial Tr. at 1745.) One advantage was that "when you

---

**3.** For example, Cofield testified that some time in June 1998, he assisted Baerga and Rivera by bringing guns to a confrontation on 137th Street with members of a rival drug gang called "Bloody Rich's Crew." Cofield brought the weapons from his apartment, where he was storing a .38 caliber gun and a PK .45 caliber gun. Baerga told Cofield to give him the .38 and Rivera told Cofield to put the .45 in a bag and bring it outside. When they got outside, Cofield took the gun out and loaded it. Rivera took it from him and started shooting at members of Bloody Rich's Crew. (Trial Tr. at 2504–12.)

run a club, you own [the] spotlight. You attract all the big drug dealers to your club." As a club organizer, one could give drug dealers free alcohol, such as champagne, and in return the dealers would help the organizer "get connected," meaning obtain access to "wholesale drug dealers." (Trial Tr. at 1746.) According to Rodriguez, Santiago told him that running The Loft was a "time in his life that he enjoyed the most" because "he made so much money." (Trial Tr. at 1746.) When asked if Santiago said anything about how The Loft would help his narcotics business, Rodriguez testified that Santiago stated that he wanted to expand his heroin business beyond sales on 137th Street and start distributing to other drug dealers. (Trial Tr. 1746–47.)

### b. *Attempted Murder of Martinez*

On April 19, 1998, Martinez and several friends named Ellison, Trevor, Justin and Danny, met Martinez's brother at a nightclub at 153rd Street and Elton Avenue in the Bronx, the location of The Loft.[4] (Trial Tr. at 2048.) Inside the club, there were some individuals wearing black and yellow beads, indicating that they were members of a gang called the "Latin Kings," and other individuals wearing black and red beads, indicating that they were members of a gang called the "Bloods." (Trial Tr. at 2049.) At some point, "there was a

stare between [Martinez's] brother and a light skin male Hispanic ... [T]hey had a little verbal dispute and they settled it." (Trial Tr. at 2051.) A little later the same person and others with him bumped Martinez's brother and Ellison several times. One of them approached Martinez's brother, said "yo, what's up," and tried to cut him with a razor. (Trial Tr. at 2052.) A fight broke out between Martinez's group and ten to fifteen people who were with the same "light skin male Hispanic." (*Id.*) Another "light skin male Hispanic [with] strong facial features and a goatee pulled out a gun" and shot at Martinez's brother. (*Id.*) Martinez pulled his brother down and a bullet grazed his brother's head. A number of people tried to punch and kick them as they lay on the ground. A "bouncer" attempted to pick Martinez's brother up but he kicked the bouncer and ran with Martinez towards the stairs leading out of the nightclub. As they were going down the stairs, someone fired a gun a second time.[5] (Trial Tr. at 2052.)

Once they were outside, Martinez and his brother ran. Martinez turned around and saw "the bouncer ... jog towards the corner" and shoot at him. According to Martinez, "another short dark skin male with braids came out of nowhere and started chasing me." (Trial Tr. at 2054.) He was about five feet, three inches tall and

---

4. Although Martinez testified that he went to Club X, a rational juror could have reasonably concluded that he confused the name of the nightclub and actually went to The Loft, which, according to Cofield, was one floor above Club X. Martinez's description of that evening was corroborated by the testimony of Carvajal and Cofield and it is very unlikely that there was more than one fight and shootout at the same address that night. Furthermore, Sara Carvajal (hereinafter "Carvajal"), another witness at trial who was accidently shot at the Loft, testified that she saw Martinez next to her in the emergency room on the same night. (Trial Tr. at 2034, 2063.)

5. Martinez testified that a gun was fired while they were going down the stairs. At trial, Carvajal testified that she was dancing when a fight broke out and the DJ announced that someone had a gun. As she was running with a large crowd towards the door, she was accidently shot in the lower back. (Trial Tr. at 2032–33.) Although certain details of Carvajal's testimony about the shooting are different from Martinez's testimony, their recollections were sufficiently similar for a rational juror to have concluded that they were describing the same incident.

had corn row braids. This person was trying to put "bullets or a clip" into a "little gun." Martinez told him to "chill," but the assailant ran towards Martinez and shot him twice. One bullet entered the right side of Martinez's hip and another bullet entered his left buttock. After he was hit, Martinez saw a white BMW pull up and the assailant got in the car. Martinez saw a person on the passenger seat of the car who looked similar to the bouncer whom he had seen earlier. (Trial Tr. at 2055–56.) The car drove away.

At trial Martinez's testimony was corroborated by the testimony of Michael Cofield. Although Cofield was not present during the incident, he heard members of Thief David's Crew talk about it the next day. According to Cofield, a friend named "Sopine" told him one morning that there had been a shooting at The Loft the night before. (Trial Tr. at 2461.) Sopine told Cofield that someone at The Loft had been staring at another friend named "Junebug" (hereinafter "Junebug"), a member of Santiago's gang. He further told Cofield that Santiago approached the person and asked him "what's up," meaning what is the problem. (Trial Tr. at 2462.) The person punched Santiago in the face and a fight broke out. Sopine's account to Cofield also indicated that "a girl got shot, a guy got shot and Cuso [Baerga] was going to shoot somebody and Stinker [Williams] tried to grab the gun from him and the gun went off, and he took the gun and ran outside and shot a guy."

Later in the day, Cofield joined Santiago, Williams, and other members of Thief David's Crew on 137th Street. They were laughing and joking about the shooting at The Loft the night before. (Trial Tr. at 2464.) Cofield heard Williams describe the shooting at The Loft from the previous evening. Williams stated that he was trying to get the gun from Baerga when it went off. After the gun went off, Williams grabbed it from Baerga and chased the "guy that started it all" down the stairs. (*Id.*) Once he was outside, another person warned Williams to "chill" and Williams shot that person instead. In addition to hearing Williams, Cofield heard Santiago talk about how he wanted to prevent a fight from occurring because he did not want the nightclub to shut down. In response, Baerga said "we couldn't let it go down like that." (Trial Tr. at 2465.) When asked about the meaning of Baerga's statement, Cofield explained that because Santiago owned The Loft, if someone provoked a fight and nothing was done, people would be "coming and disrespecting [Santiago] in his own club," and "it would make everybody look soft." (*Id.*) According to Cofield, Santiago "kind of agreed" with Baerga but he also said that "he didn't want it to go down like that." (Trial Tr. at 2466.)

Cofield also spoke about the shooting with Cherry, who was at The Loft at the time of the fight. Cherry told Cofield that a fight broke out at The Loft and a gun went off. He ran outside and saw Williams chasing someone. Another person warned the person whom Williams was chasing, and Williams shot that person. (Trial Tr. at 2466.) According to Cofield, Cherry was joking about how the victim was telling Williams to "chill." (*Id.*) Cofield also testified that he read about the shooting at The Loft in an article published the following day in the *Daily News*. (Trial Tr. at 2467.) Members of the enterprise, including Santiago and Williams, carried the article around in their pockets. (Trial Tr. at 2468.) Cofield testified that Williams expressed some relief that the article made no mention of the later shooting that occurred on the street. (Trial Tr. at 2468–69.) On a separate occasion, described in Part III.B, *infra*, the police found the same article in a pack of New-

port cigarettes, recovered from a minivan that Santiago was driving when he was arrested. (Trial Tr. at 3281–82.)

### 2. Discussion

 Section 1959 makes it a federal crime for a person to commit violent crimes in aid of racketeering, and the statute contains a motive requirement. *See United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001) (citing 18 U.S.C. § 1959(a)).[6] Under the statute, a defendant's motive must be that of receiving payment or promise of payment of anything of pecuniary value from the racketeering enterprise or "gaining entrance to or maintaining or increasing position" in the enterprise. *Id.* The definition of a pecuniary motive is fairly self-explanatory. *Id.* With regard to the two other motives, "[s]elf-promotion need not have been the defendant's only, or even his primary, concern, if [the criminal act] was committed 'as an integral aspect of membership' in the enterprise." *Id.* (citing *United States v. Thai,* 29 F.3d 785, 817 (2d Cir.1994) and *Concepcion,* 983 F.2d 369 at 381). The government satisfies the motive requirement if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Concepcion,* 983 F.2d at 381. Section 1959 also reaches defendants who, although they may not be members, are somehow associated with a racketeering enterprise and participate in the organization's activities with the aspiration of becoming members. *See United States v. Polanco,* 145 F.3d 536, 540 n. 2 (2d Cir.1998), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 803, 142 L.Ed.2d 664 (1999); *see also United States v. Malpeso,* 115 F.3d 155, 159 n. 1, 164 (2d Cir.1997).

 Drawing all reasonable inferences in favor of the Government, there was more than sufficient evidence for a rational juror to conclude that Williams was the person who shot Martinez on April 19, 1998. Martinez described the assailant as someone fitting Williams's description and Williams, by Cofield's account, stated that he shot a person who told him to "chill." According to Martinez, himself, this is precisely what he told his assailant before he was shot.[7]

Based on the testimony presented at trial, a rational juror could have reasonably concluded that: (1) a fight broke out at The Loft involving Martinez and his brother; (2) Baerga pulled out a gun that Williams also wanted to use; (3) Williams and Baerga struggled over the gun and accidently shot Sara Carvajal; (3) Williams grabbed the gun and chased Martinez and his brother as they ran out of the nightclub; and (4) Williams shot Martinez twice as he was running away and telling Williams to "chill."

 Williams maintains that even if there was sufficient evidence that he shot Martinez, there was insufficient evidence to establish federal jurisdiction over the alleged acts, namely that he conducted or participated in the conduct of the affairs of

---

6. 18 U.S.C. § 1959(a) states:
 Whoever ... for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, ... assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, ... or attempts ... so to do, shall be punished....

7. Furthermore, Cofield testified that he and others frequently brought guns for Santiago and other members of the enterprise when they went to nightclubs. A juror could have reasonably inferred that Williams and Baerga had access to such guns because they worked as security at The Loft.

the enterprise through the shooting, as charged in Racketeering Act Four; or that he committed the shooting "for the purpose of gaining entrance to and maintaining and increasing" his position in Thief David's Crew, as charged in Count Four. The Court disagrees.

There was more than sufficient evidence that Williams attempted to murder Martinez because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership. *See Concepcion,* 983 F.2d at 381. As discussed above, Rodriguez testified that one of the main advantages of running a nightclub was to have the "spotlight," and to get connections to wholesale drug dealers. Rodriguez also testified that Santiago wanted to expand his heroin business beyond sales on 137th Street and start distributing to other drug dealers. Based on this testimony, a rational juror could have reasonably concluded that one of the principal reasons that Santiago ran The Loft was to expand his heroin business. One corollary of such a conclusion is that the reputation of Santiago and his enterprise was important to both his narcotics business on 137th Street and to his desire to expand the business.

According to Cofield, the following day Baerga said "we couldn't let it go down like that," and Santiago "kind of agreed." (Trial Tr. at 2465–66.) Although there was testimony that Santiago wanted to prevent a fight from occurring at The Loft, a reasonable juror could have inferred that Williams and Baerga, acting in their roles

as security for The Loft and as "enforcers" of Thief David's Crew, believed that protecting the enterprise's reputation of being strong and powerful by promptly responding to an insult to its leader was as integral to their functions as members of the enterprise as preventing others from committing violence at The Loft.

At trial, there was ample evidence that Santiago and his enterprise took control of the narcotics business on 137th Street through threats and acts of violence. *See* Part III.A, *infra.* In light of such evidence, a juror could have reasonably inferred that the reputation of Thief David's Crew was essential to the enterprise's control of the narcotics business on 137th Street. One corollary of such an inference is that the response of Williams and Baerga to the fight at The Loft was intended both to protect the reputation of Thief David's Crew and to maintain control of the enterprise's narcotics business on 137th Street. *See Concepcion,* 983 F.2d at 381 (holding that defendant's intent to attack another person who was defying enterprise's control of a particular "drug spot" was sufficient to establish motive requirement under 18 U.S.C. § 1959).[8] Furthermore, the fact that Santiago, Williams and other members of the enterprise carried a *Daily News* article about the shooting in their pockets could have been interpreted to suggest that they were proud of the incident. A jury could have also reasonably inferred that members of Thief David's Crew believed that the attack was beneficial because it enhanced the reputation of the enterprise among

**8.** The fact that Santiago may have preferred to avoid violence because he believed that it would risk his enterprise's operation of The Loft and therefore his opportunities to make money does not mean that the fight and shootings were unconnected to the conduct of the affairs of Thief David's Crew. Just the opposite, Baerga told Santiago that they

"couldn't let it go down like that" because, as Cofield explained, it would make everybody "look soft," especially in light of the fact that Santiago was being "disrespected" in his own nightclub. Under the circumstances, it obviously was not possible for Williams and Baerga to consult with Santiago and agree upon a particular course of action.

other local drug gangs, even if Santiago personally felt that it had jeopardized their operation of The Loft as a nightclub. Crediting the testimony of Cofield, Martinez and Carvajal, a juror could have reasonably concluded that on April 19, 1998, Santiago was punched in the face in connection with a fight that involved Martinez's brother and that Williams and Baerga attacked Martinez's brother as a result. A rational juror could have also concluded that Williams's shooting of Martinez was more than an attempt to gain revenge. It was an attempt by one of the "enforcers" of Thief David's Crew to protect the reputation of the enterprise and its leader—a reputation which was deemed essential to the success of the· organization's narcotics business—as an integral aspect of his membership in the enterprise. *See Ferguson*, 246 F.3d at 134.[9]

### III. *CLAIMS BY JOSE SANTIAGO*

Santiago was charged in Counts One, Two, Three and Nine. Although Santiago asserts that he joined in the motion by Williams with respect to· each and every count in the indictment, he specifically moved for a judgment of acquittal on Counts One and Nine.

### A. *COUNT ONE*

■ Count One charged that Santiago participated in the operation and management of Thief David's Crew through a pattern of racketeering activity. Santiago's pattern of racketeering activity allegedly consisted of his participation in at least two of three charged racketeering acts: (1) a narcotics conspiracy from 1994 through March 2000 to distribute and possess with intent to distribute crack cocaine, heroin, and marijuana; (2) the extortion in July 1995 of "Victim # 1," identified at trial as "Red;" and (3) the conspiracy to extort numerous individuals in the Bronx, New York from 1994 through March of 2000.[10] Santiago asserts that there was insufficient evidence with respect to his alleged participation in the charged acts of extortion and conspiracy to commit extortion. Santiago argues that he is entitled to a judgment of acquittal because, at most, the evidence at trial established only one racketeering act. The Court disagrees.

■ To find Santiago guilty of a conspiracy to commit extortion, the jury was required to determine that the Government had proven the following two elements beyond a reasonable doubt: first, the existence of the conspiracy to commit extortion; and second, that Santiago knowingly associated himself with the conspiracy and participated in the conspiracy to extort individuals.[11] At trial, there was

9. Because the Court concludes that there was sufficient evidence for a rational juror to conclude that Williams shot and attempted to murder Martinez, as charged in Count Four, the Court also finds that there was sufficient evidence for a rational juror to conclude that Williams unlawfully, willfully and knowingly used and carried a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, as charged in Count Eight.

10. The Court notes that there was overwhelming evidence at trial that Santiago not only participated in the narcotics conspiracy charged in Racketeering Act One of Count

One and Count Three, but that he was the leader of the conspiracy. There was also substantial evidence that Santiago was not only a knowing member of the RICO conspiracy charged in Count Two, but that he was the leader of that conspiracy as well. To the extent that Santiago joins in the motion by Williams on these counts, on the basis of the Court's assessment of the trial record and the considerations already discussed above in connection with Williams's motion, Santiago's motion is denied.

11. Under New York law, extortion is defined as the wrongful taking of property from its owner, with an intent to permanently deprive

substantial evidence that Santiago and his enterprise controlled narcotics sales on 137th Street. In addition, the evidence sufficiently showed that Santiago agreed with and directed members of Thief David's Crew to extort individuals who sold narcotics on the Block controlled by his enterprise.

Rodriguez testified that in late 1993 or early 1994, drugs sales on the Block were controlled by a gang called the "Bell Brothers." (Trial Tr. at 1557.) Santiago told Rodriguez and Joseph Rini (hereinafter "Rini") that he wanted to "take over [the] block," meaning that anyone who wanted to sell on the Block would have to pay "rent" to Santiago instead of the Bell Brothers. (Trial Tr. at 1559.) Rodriguez described rent as a fee that was charged to sell drugs on the Block. (Trial Tr. at 1562.) Rini arranged a meeting with Santiago and "Silk," who was the leader of the Bell Brothers at the time. (Trial Tr. at 1560–61.) At the meeting, Santiago told Silk that his "services [were] no longer needed and [that] if he want[ed] to continue working on his block, [Silk] would have to pay Santiago rent." (*Id.*) After the meeting, Santiago told Rodriguez and others that "whoever wanted to work on the block would have to pay him rent now." (Trial Tr. at 1562.) Rodriguez also testified that "Nate," a drug dealer who sold drugs on the Block before Santiago took over, was not willing to pay Santiago rent. Approximately one week later, Santiago fired a gun at Nate when Santiago saw Nate on the Block. (Trial Tr. at 1563.)

Cofield testified that when he moved to the Milbrook Houses in September 1997, Santiago "owned the block," meaning that "he [sold] drugs down there and him and people he mess[ed] with [could] only sell

down there." (Trial Tr. at 2422.) According to Cofield, if anyone other than Santiago's friends wanted to sell drugs on the Block, they were required to pay "rent," meaning a portion of the proceeds that they made from drug sales. (*Id.*) Paul Flores (hereinafter "Flores"), another witness, testified that he sold drugs on the Block for Santiago and "Dela" (hereinafter "Dela"), one of Santiago's associates, in 1994 and 1995. Some time in 1994, he heard Santiago tell a person nicknamed "Redhead" that if he wanted to sell drugs in any of the buildings, he had to pay Santiago "rent." (Trial Tr. at 2339.) Flores described "rent" as "when you pay somebody [a] certain amount of money, whatever it is, to be able to distribute drugs [in] a certain location." (*Id.*)

■■■ These facts and others presented at trial were more than sufficient to support a finding of: (1) the existence of a conspiracy to extort money from individuals who wanted to sell narcotics on 137th Street; and (2) Santiago's active participation in, if not leadership of, such conspiracy. The fact that Santiago fired a handgun at a drug dealer who had refused to pay him rent was evidence from which a juror could have reasonably inferred that Santiago intended to collect money by instilling fear in persons who wanted to sell narcotics on "his block." Therefore, because there was sufficient evidence for a rational juror to reasonably conclude that Santiago was guilty of two predicate racketeering acts, namely, the conspiracy to commit extortion charged in Racketeering Act Six and the narcotics conspiracy charged in Racketeering Act One, a juror could have also reasonably concluded that Santiago engaged in a pattern of racke-

---

the owner of such property, through intentional threats that instill in the owner a fear that, if the owner did not deliver the property

to the person, the person would harm the owner of the property. *See* N.Y. Penal Law § 155.05(2)(e) (McKinney 2002).

teering activity, in violation of RICO.[12] Accordingly, Santiago's Rule 29 motion with respect to Count One is denied.

## B. *COUNT NINE*

Count Nine charged that on May 14, 1998, Santiago, "unlawfully, willfully and knowingly used and carried a firearm during and in relation to the narcotics conspiracy charged in Count Three." (Indictment ¶ 30.) Santiago concedes that firearms were seized from a car that he was driving on May 14, 1998, but asserts that there was insufficient evidence that such firearms were being "used or carried during and in relation" to the charged narcotics conspiracy.

To establish that a defendant has violated 18 U.S.C. § 924(c) (hereinafter " § 924(c)"), the Government must prove beyond a reasonable doubt that the defendant either "used or carried" a firearm "during and in relation to" drug trafficking or a crime of violence. A conviction under the "use" prong requires the Government to establish "active employment of the firearm" by the defendant. *Rosario v. United States*, 164 F.3d 729, 735 (2d Cir.1998) (citing *Bailey v. United States*, 516 U.S. 137, 144, 116 S.Ct. 501; 133 L.Ed.2d 472 (1995)). "Active employment" includes, *inter alia*, "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire" the weapon. *Id.* (citing *Bailey*, 516 U.S. at 148, 116 S.Ct. 501). A defendant "carries" a firearm under § 924(c) if "during and in relation to the drug trafficking crime, [the defendant] either (1) had physi-

cal possession of the firearm, ... or (2) moved the firearm from one place to another." *Id.* (quoting *United States v. Canady*, 126 F.3d 352, 358 (2d Cir.1997)). The Government is not required to establish that the firearm was immediately accessible to the defendant to satisfy the "carry" prong of a violation of § 924(c). *See Muscarello v. United States*, 524 U.S. 125, 136, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998).

In the instant case, New York City police detective Robert Addolorato (hereinafter "Addolorato") testified that on May 14, 1998, he and his partner at the time, former New York City police detective Alberto Quinones (hereinafter "Quinones"), saw Santiago driving alone in a blue Mazda minivan on Cypress Avenue in the Bronx between 138th and 139th Streets. (Trial Tr. at 3278.) They followed Santiago, who made a U-turn and stopped in front of a barber shop near the corner of 139th Street and Cypress Avenue. (Trial Tr. at 3279.) According to Quinones, Santiago exited his car and appeared to be going into the barber shop. (Trial Tr. at 2126.)

Quinones and Addolorato approached Santiago and placed him under arrest. At trial, when asked why they arrested Santiago, Quinones testified that he "believe[d] it was for the unauthorized use of a vehicle." (Trial Tr. at 2112.) Addolorato testified that they arrested Santiago for his alleged tampering with a witness named Anthony Sims in connection with the ongoing state prosecution of two of Santiago's associates, Rafael Guttierez and Richard

---

**12.** Even if, as Santiago contends, evidence of fear was necessary for a juror to find that he committed extortion under New York law, such evidence was clearly not necessary to find that Santiago was guilty of a conspiracy to commit extortion. It is well established that a conspiracy need not accomplish its ultimate aims or objectives for a conspirator

to be found guilty. *See, e.g., United States v. Labat*, 905 F.2d 18, 21 (2d Cir.1990) ("Since the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective, the offense of conspiracy may be established even if the collaborators do not reach their goal").

Mercado. (Trial Tr. at 3277.) Santiago signaled to Rivera, who was close by, to take the van. (Trial Tr. at 3279.) When they learned that Rivera did not have a license, Quinones and Addolorato called for a back-up police car to take Santiago to the police station for the 40th Precinct and Addolorato drove the minivan to the police station. (Trial Tr. at 2114.) At the police station, they initially planned to hold the van until someone with a license came to pick it up. However, they subsequently discovered a set of stolen license plates behind the front passenger seat of the van and a "Newports" cigarette box on the floor, containing a .22 caliber bullet and a cut-out of a newspaper article about the April 19, 1998 shooting at The Loft. (Trial Tr. at 3281–82.)

Quinones testified that soon thereafter, several of Santiago's friends, including a person nicknamed "Bill Blass," arrived at the police station "maybe to take the minivan." (Trial Tr. at 2115.) However, by that point, he and Addolorato had already decided to "voucher" the van.[13] (Trial Tr. at 2115, 2129.) Quinones conducted an inventory of the van and found a hydraulic "trap," or a secret compartment, inside one of the passenger bench seats. (Trial Tr. at 2118.) Inside this trap were two guns, "a small Derringer type gun and a .380 automatic." (Trial Tr. at 2118.)

### 1. "Use" under § 924(c)

■ At trial, there was no evidence that Santiago was "using" the two guns within the meaning of 18 U.S.C. § 924(c). The guns seized from the minivan that Santiago was driving were secretly hidden in a trap behind the driver's seat and there was no way that he could have been "actively employing" them. *See Rosario,* 164 F.3d at 734 ("A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds, or for placement of a firearm to provide a sense of security or to embolden.") (quoting *Bailey,* 516 U.S. at 149, 116 S.Ct. 501). Therefore, the pertinent question is whether a rational juror could have reasonably concluded that Santiago was "carrying" the two guns "during and in relation to" the narcotics conspiracy charged in Count Three.

### 2. "Carry" under § 924(c)

In *Muscarello,* the Supreme Court noted that the primary meaning for the word "carry" is to "convey, originally by cart or wagon, hence in any vehicle, by ship, on horseback, etc." *Muscarello,* 524 U.S. at 128, 118 S.Ct. 1911. The Court ultimately held that "[g]iven the ordinary meaning of the word 'carry,' it is not surprising to find that the Federal Courts of Appeals have unanimously concluded that 'carry' is not limited to the carrying of weapons directly on the person but can include their carriage in a car." *Id.* at 131, 118 S.Ct. 1911 (citing *United States v. Giraldo,* 80 F.3d 667, 676–77 (2d Cir.1996)). The Supreme Court went on to state that "the [petitioners'] interpretation [that the word 'carry' means 'immediately accessible'] is difficult to square with the statute's language, for one 'carries' a gun in the glove compartment whether or not that glove compartment is locked. Nothing in the statute's history suggests that Congress intended that limitation." *Id.* at 138, 118 S.Ct. 1911.

■ In the instant case, there was sufficient evidence to support a conclusion that Santiago was knowingly carrying the guns found in the minivan that he was driving. The evidence at trial established that Santiago and members of Thief

---

**13.** According to Quinones, when the police "voucher" a vehicle, they take custody of it and conduct a thorough inventory of its contents. (Trial Tr. at 2116.)

David's Crew used many kinds of firearms to maintain control over narcotics sales on 137th Street. Rodriguez testified that on one occasion, as discussed above, Santiago shot a handgun at a person called Nate who had failed to pay Santiago "rent," soon after Santiago took control of the Block in 1994. (Trial Tr. at 1563.)

Cofield testified that when he was living in the Milbrook Houses, he saw members of Thief David's Crew sell narcotics while possessing firearms many times. (Trial Tr. at 2450.) He saw "[n]ine millimeters, .38s, .25s, .22s, .357s, all kinds of guns," as well as a larger gun that "takes .45 bullets." (Trial Tr. at 2450–51.) According to Cofield, these guns were all owned by Santiago. (Trial Tr. at 2451.) When asked how he knew this, Cofield testified that "[h]e [Santiago] says these are my guns. And when I was working for him he did say [sic] if anybody is selling a gun buy it off the top," meaning that the money used to buy guns came out of the group's proceeds from narcotics sales before anyone was paid a personal commission for selling narcotics. (Id.) The guns were used when Santiago or members of the enterprise got into "any problems." (Trial Tr. at 2452.) In addition, Santiago decided where members of the enterprise would store the guns. (Id.) Cofield also testified that in the latter half of 1999 and early 2000 he went to nightclubs with Santiago and other members of Thief David's Crew almost every weekend. (Trial Tr. at 2576.) On many occasions, Santiago told Cofield to meet him later at a nightclub with a gun, and on other occasions, Santiago called Cofield from a nightclub and told him to come with a gun. (Id.)

Based on these facts, and others presented at trial, there was more than sufficient evidence to reasonably support an inference that Santiago knew t at there were firearms being stored in the "trap" of

the Mazda minivan that he was driving on May 14, 1998 and that he was "carrying" the firearms within the meaning of 18 U.S.C. § 924(c). However, this conclusion does not end the Court's analysis. To convict Santiago on Count Nine, the Government was also required to prove that Santiago was carrying the two guns *"during and in relation to* a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the narcotics conspiracy charged in Count Three." (*See* Indictment ¶ 30 (emphasis added).)

### 3. *"During and in relation to a drug trafficking crime" under § 924(c)*

█ Section 924(c) is "applicable only where a defendant 'carries' a gun *both* 'during *and* in relation to' a drug crime." *Muscarello*, 524 U.S. at 137, 118 S.Ct. 1911 (citing 18 U.S.C. § 924(c)(1)) (emphasis in the original). In its opposition to Santiago's Rule 29 motion on Count Nine, the Government asserts that the evidence at trial "overwhelmingly" demonstrated "the use that guns were put to in the drug conspiracy." (Trial Tr. at 4538.) The Government also points to Cofield's testimony regarding Santiago's instructions to buy guns "off the top" and to bring guns to nightclubs. Finally, the Government contends that the fact that Santiago tried to have Jesus Rivera take the van when he was arrested and that Bill Blass later tried to take the van from the police station, supports an inference that Santiago and members of his enterprise knew that there were guns in the van, "guns used to protect the conspiracy and to keep it going and to project power." (Trial Tr. at 4539.)

While the Court agrees with the Government's assertion that there was abundant evidence at trial that the carrying and use of firearms was crucial to the protection and control of the narcotics conspiracy run

by Santiago, the Court does not agree with the Government's contention that Santiago's carrying of the two guns found in the minivan at the time he was stopped and arrested on May 14, 1998 occurred "during and in relation to" a drug trafficking crime within the meaning of 18 U.S.C. § 924(c). In *Muscarello*, the Supreme Court found that Congress intended the word "carry" to have an expansive meaning, with the understanding that the words "during and in relation to" would "prevent prosecution where guns 'played' no part in the crime." *Muscarello*, 524 U.S. at 137, 118 S.Ct. 1911 (citing S.Rep. No. 98–225, at 314, n. 10); *see also United States v. Stewart*, 779 F.2d 538, 539 (9th Cir.1985) (Kennedy, J.) (observing that " 'in relation to' " was "added to allay explicitly the concern that a person could be prosecuted … for committing an entirely unrelated crime while in possession of a firearm"), *overruled in part on other grounds, United States v. Hernandez*, 80 F.3d 1253, 1257 (9th Cir.1996).

In the instant case, Detectives Addolorato and Quinones arrested Santiago as he was about to enter a barber shop. There was no evidence from which a juror could reasonably conclude that, at that particular time, Santiago was engaged in any act of purchasing, selling, discussing or planning any activity related to the distribution of narcotics. In fact, according to the testimony of Addolorato, as already stated above, the underlying arrest of Santiago that resulted in the seizure of the minivan was based on a state charge of witness tampering, and therefore had nothing to do with any drug trafficking at the time.

The Government's reasoning appears to be that the generalized context of the narcotics conspiracy which Santiago was a member of during that time period was sufficient to meet the "during and in relation to" requirement under § 924(c). Santiago controlled the sale of drugs on "his block" only two blocks away from his arrest and, as the leader of the drug conspiracy, he owned the group's firearms and directed where they would be stored. However, in this Court's view, a conviction based on these facts would be inconsistent with the language of the statute and the Supreme Court's reasoning in *Muscarello*.

In *Muscarello*, petitioners argued that the scope of the word "carry" under § 924(c) was limited "to instances where a gun in a car is immediately accessible, thereby most likely excluding from coverage a gun carried in a car's trunk or locked glove compartment." *Muscarello*, 524 U.S. at 137, 118 S.Ct. 1911. The Supreme Court rejected this argument stating:

> Once one takes account of the words 'during' and 'in relation to,' it no longer seems beyond Congress' likely intent, or otherwise unfair, to interpret the statute as we have done. If one carries a gun in a car 'during' and 'in relation to' *a drug sale, for example,* the fact that the gun is carried in the car's trunk or locked glove compartment seems not only logically difficult to distinguish from the immediately accessible gun, but also beside the point.

*Id.* at 137–38, 118 S.Ct. 1911 (emphasis added). Although the Supreme Court's reference to a "drug sale" was only illustrative, it implies an understanding that Congress intended to criminalize specific events or activities related to drug trafficking crimes or crimes of violence when it enacted § 924(c). *Cf. Stewart*, 779 F.2d at 539–540 (citing S.Rep. No. 98–225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3490–92). If liability under § 924(c) were triggered any time that a member of a drug conspiracy carried a firearm, then the statute's use of the words "during and in relation to" would be superfluous. Accordingly, the Court grants Santiago's motion with respect to Count Nine.

## IV. *CLAIMS BY ADRIAN AGOSTINI*

Count Three charged that defendant Agostini knowingly became a participant in the aforementioned narcotics conspiracy to distribute and possess with intent to distribute heroin, crack cocaine, and marijuana. Count Six charged that on March 18, 2000, Agostini, Lawrence Cherry and others, unlawfully, willfully, and knowingly assaulted "Victim # 8" with a dangerous weapon, causing serious bodily injury in the vicinity of 575 St. Anns Avenue, in Bronx, New York, for the purpose of "gaining entrance to and maintaining and increasing their positions in Thief David's Crew," in violation of 18 U.S.C. § 1959(a)(3). The Government has identified Victim # 8 as Paul Crowder, who appeared as a witness during the course of the trial. Unlike Santiago and Williams, Agostini was not charged in Count One with participating in the conduct of the affairs of Thief David's Crew through a pattern of racketeering activity or in Count Two with conspiring to do the same.

### A. *COUNT THREE*

■ Agostini maintains that there was insufficient evidence at trial for the jury to convict him on Count Three. In support of his argument, Agostini asserts that he neither sold drugs with members of Thief David's Crew, nor received drugs from them, nor provided or received any money in connection with drugs being sold by Thief David's Crew. (*See* Trial Tr. at 4543.) He maintains that Cofield and Rodriguez testified that he was not a part of their group, thus providing additional evidence that he was not a member of their conspiracy to sell narcotics. (*See id.*) The Government concedes that there was no evidence presented at trial that Agostini was personally selling drugs on 137th Street or that he was providing or receiving proceeds from narcotics sales. Instead, it asserts that such evidence is not required

for a rational juror to conclude beyond a reasonable doubt that Agostini became a knowing member of the narcotics conspiracy. The Court agrees.

To find Agostini guilty of Count Three, the jury was required to determine that the Government had proven the following two elements beyond a reasonable doubt: first, the existence of the conspiracy charged in the Indictment; and second, that Agostini became a member of the conspiracy—that is, that he knowingly associated himself with the conspiracy and participated in the conspiracy to distribute narcotics and to possess narcotics with the intent to distribute them. *See* 21 U.S.C. § 846; *see also United States v. Shabani,* 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (holding that proof of an overt act is not required to establish a violation of 21 U.S.C. § 846).

In the instant case, there were several pieces of circumstantial evidence from which a juror could have reasonably inferred that Agostini became a knowing member of the charged conspiracy. At trial, there was ample evidence that Agostini bought and sold narcotics on multiple occasions. Cabrera testified that after Agostini got out of jail in 1999, he sold narcotics to "make ends meet." (Trial Tr. at 811.) On five to six occasions, Agostini gave Cabrera, in Agostini's apartment on 139th Street between St. Anns and Brook Avenues, amounts of crack cocaine for sale worth approximately six hundred dollars. (Trial Tr. at 812.) Agostini gave Cabrera a twenty percent commission on the narcotics that Cabrera sold. (*Id.*) In the summer of 1999, Cabrera saw Agostini chopping up a three inch block of crack cocaine on his dresser and putting it into little red bags. (Trial Tr. at 813–14.)

In addition, the Court admitted, with a limiting instruction, Agostini's June 16,

1998 guilty plea in connection with his role in a sale of narcotics on East 140th Street in the Bronx. As the Court instructed the jury, the Government was permitted to introduce the plea allocution in an attempt to establish that Agostini knowingly became a member of the conspiracy charged in Count Three, and was not just innocently associating with Santiago and others on 137th Street. *See United States v. Pitre*, 960 F.2d 1112, 1118 (2d Cir.1992) (citing *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir.1987)).

Moreover, Cofield testified that at the end of November or beginning of December in 1999, Agostini frequently went to 137th Street to "hang with" Cofield for several hours. (Trial Tr. at 2681.) Agostini would "come to the block, park the car," and Cofield would watch a television mounted in Agostini's car and "smoke weed." (*Id.*) When asked what Agostini was doing for money at the time, Cofield testified that "[h]e had crack on his block." (Trial Tr. at 2682.) During this time period, Cofield sold heroin in bags and bundles every evening between approximately 6 p.m. and 10 p.m. He typically sold narcotics to 15 to 20 customers in one evening. (Trial Tr. at 2689.) Between sales, Cofield would stand in front of nearby buildings or sit in someone's car, including Agostini's Nissan Altima, to keep warm and "smoke weed." (Trial Tr. at 2689–90.) Cofield testified that he recalled sitting in Agostini's Altima on several occasions with Agostini, Santiago and Rodriguez. (Trial Tr. at 2693.) He also testified that he gave Santiago money from his heroin sales while sitting in Agostini's car on at least five or six occasions. (Trial Tr. at 2693.) Cofield would discuss his heroin sales with Santiago and Santiago would count the money in the car. (Trial Tr. at 2694.)

Finally, the Government presented several videotapes during the trial which,

combined with the evidence described above, could have reasonably supported a conclusion that Agostini became a knowing member of the charged conspiracy. The videotapes showed Agostini, Santiago, Rodriguez and others loitering, drinking, talking and entering and exiting each other's cars on 137th Street on several evenings. One videotape showed Agostini, Santiago, Rodriguez and Cofield, standing next to an alley where Rodriguez testified the group generally engaged in "hand-to-hand [narcotics] sales." (Trial Tr. at 1695.) On another videotape, Agostini was sitting in the driver seat of his car with the door open. (*See* Govt. Ex. 54 at 21:28 to 21:30.) Next to the open door, Rodriguez handed Santiago money. (*Id.*) On another videotape, Santiago and Cofield were close to Agostini's car, counting money together. (*See* Trial Tr. at 1717–18 and Govt. Ex. 76B at 19:51 to 19:52.)

These facts and others presented during the trial were more than sufficient for a rational juror to have concluded that Agostini knew that Santiago and members of his enterprise were operating a drug conspiracy on 137th Street, and that Agostini became a knowing member of such conspiracy. Agostini's assertion that there was insufficient evidence that he sold narcotics or received proceeds from narcotics transactions is of no consequence. Evidence of engaging in actual narcotics transactions or receiving proceeds from them is not necessary for the Government to establish a violation of 21 U.S.C § 846. In order for the jury to convict, it needed only to find beyond a reasonable doubt that Agostini entered into an agreement with Santiago and others to distribute and possess with intent to distribute narcotics. *See U.S. v. Chalarca*, 95 F.3d 239, 245 (2d Cir.1996). It was not necessary to prove the commission of any overt acts in furtherance of the conspiracy.

*See Shabani,* 513 U.S. at 13, 115 S.Ct. 382. Numerous facts presented at trial, including the videotapes and Cofield's testimony that Agostini was present, on at least five or six occasions, when Santiago and Cofield were sitting in his car, counting money from heroin sales and discussing the type of heroin that was being sold, could easily have supported an inference that the conspiracy charged in Count Three existed and that Agostini was a knowing member of such conspiracy.

## B. *COUNT SIX*

 Agostini asserts that there was insufficient evidence to convict him of violating 18 U.S.C. § 1959. As discussed above, § 1959 criminalizes engaging in certain activities, such as murder, attempted murder, and conspiracy to commit murder "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." *See* 18 U.S.C. § 1959. By its ordinary usage, the phrase "for the purpose of .... maintaining or increasing position in" the enterprise means that the defendant had to have held a position in the enterprise and committed the charged underlying crime of violence with a motive of retaining or enhancing that position. *See Concepcion,* 983 F.2d at 381. Alternatively, a defendant who is not a member of the enterprise may be found guilty of violating § 1959 if he commits a violent crime for the purpose of "gaining entrance" to the enterprise. *See* 18 U.S.C. § 1959(a); *see also United States v. Brady,* 26 F.3d 282, 290 (2d Cir.1994); *United States v. Ferguson,* 49 F.Supp.2d 321, 328 (S.D.N.Y. 1999).

In the instant case, Agostini was charged with assaulting Paul Crowder with a dangerous weapon, causing serious bodily injury, "for the purpose of gaining entrance to and maintaining and increasing [his] position[ ] in Thief David's Crew." (Indictment ¶ 27.) In his Rule 29 motion, Agostini asserts that even if the evidence showed that he committed a "gruesome" assault, the Government presented insufficient evidence that it was done for the purpose of gaining entrance to or increasing his position in Thief David's Crew. (Trial Tr. at 4545.)

### 1. *Factual Background*

At trial, there were conflicts in some details in various accounts about the assault on Paul Crowder on March 18, 2000, although there was also substantial concurrence and corroboration of other significant details. Crowder testified that on March 17, 2000, he attended a party at approximately 8 p.m. (Trial Tr. at 3390.) Some time around 1:30 a.m., Crowder left the party with two friends named "Drummer Boy" and "Ross" to return home. (Trial Tr. at 3391.) As Crowder, Drummer Boy and Ross approached the intersection at 139th Street and St. Anns Avenue, they encountered a group of eight to nine people. Crowder recognized several people, including Ramon Perez (hereinafter "Perez"), also known as "Spook." (Trial Tr. at 3393.) According to Crowder, Drummer Boy had experienced a "bad encounter" with the same group of people on a previous occasion and they had "cut him a few times." At that point, Crowder believed that there was "going to be a problem." (Trial Tr. at 3394.) Spook pulled Drummer Boy to the side, while Crowder waited for him on the corner. Other members of the group with Spook surrounded Crowder and taunted him, asking whether he "kept it real," and whether he could "hold [himself] down." (Trial Tr. at 3395.)

According to Crowder, they were essentially asking him if he was a "punk."

Soon thereafter, two to three cars pulled up, including a green Nissan Altima. (Trial Tr. at 3397.) Four or five people got out of the Altima and Crowder started to walk away. (Trial Tr. at 3398.) The people from the Altima followed Crowder and surrounded him, asking, "Where [are] you going?" (Trial Tr. at 3399.) One person tried to slash Crowder's face and Crowder caught his arm and pushed him onto the ground. (Trial Tr. at 3400.) Three people stabbed the back of Crowder's jacket and he fled into the vestibule of a building across the street. (Trial Tr. at 3402.) Crowder was unable to enter the building because the inner door of the vestibule was locked. The assailants who had stabbed Crowder's jacket chased him into the vestibule and one of them slashed the top and the back of his head. (Trial Tr. at 3402–03.) A "dark-skinned" person told the others to stop and Agostini walked in. (Trial Tr. at 3403.) Agostini pushed Crowder's head back and cut Crowder from the back of his ear down to two inches below his windpipe. (Trial Tr. at 3404.) The group ran out of the vestibule and Crowder was later rushed to the hospital. (Trial Tr. at 3405–06.)

At trial, Perez provided an account of the assault with a number of significantly different details. During the late evening on March 17, 2000 and the early morning on March 18, Perez and three friends were standing on the corner of 139th Street and St. Anns Avenue. (Trial Tr. at 3701–02.) [14]

At some point in the evening, Perez and his friends were approached by Paul Crowder and another person nicknamed "Drummer Boy," with whom Perez and members of his group had experienced trouble on a prior occasion. [15] Perez pulled Drummer Boy aside to talk to him. According to Perez, Drummer Boy knew that Perez wanted to talk to him about the "hard stares" that Drummer Boy and Soto had been exchanging. Perez told Drummer Boy that although he may need to get home every evening to a particular block, he had to accept the fact that the Hit Squad controlled that block and they would continue selling narcotics there. (Trial Tr. at 3707.) Perez thought that they had an agreement with Drummer Boy and that there would "be no problems." (*Id.*) Drummer Boy told Perez that he wanted to fight Soto. Perez told Drummer Boy that he could not allow that to happen because it would attract police attention and also because Perez would have to get revenge if Drummer Boy harmed Soto. (Trial Tr. at 3708.)

After several minutes, Perez heard someone acting "raucous" nearby. (Trial Tr. at 3708.) He walked toward the noise and discovered that it was Paul Crowder "acting up" and saying that "no one wanted to fight." (Trial Tr. at 3709.) Perez approached Crowder and as he was speaking to him, Agostini drove up in his green Nissan Altima. Agostini, Lawrence Cherry, and Cofield got out of the car. Both Agostini and Cofield were holding knives.

14. Perez testified that he was a member of a gang called the "Hit Squad." Around this time, Santiago was supplying Perez's brother with heroin and members of the two groups, which once had been rivals, cooperated and spent time with each other.

15. Perez testified that approximately two weeks before March 18, 2000, Perez, his brother and another member of the Hit Squad named Rafael Soto (hereinafter "Soto") encountered Drummer boy outside a store called "Joe's." (Trial Tr. at 3702.) According to Perez, Drummer Boy was drunk and was "carrying on" and arguing with a woman that they knew. (Trial Tr. at 3703.) Perez's brother punched Drummer Boy and Soto stabbed him with a knife.

(Trial Tr. at 3711–12.) Either Agostini or Cofield asked if there was a problem and Perez explained that he had taken care of it. Perez testified that after they talked briefly, Crowder stated, "[n]iggers is pussy anyway," understood to mean that they were all cowards and too afraid to fight. (Trial Tr. at 3715.) Perez asked Crowder who he was referring to. Crowder replied, "It ain't nothing Spook [Perez], niggers know who I'm talking to." According to Perez, Crowder was referring to the people who "jumped out" of Agostini's car, namely Agostini, Cofield and Lawrence Cherry. (Trial Tr. at 3715–16.) At that point, Agostini lunged at Crowder with a knife. Crowder ran down the street with Agostini and several others chasing after him. (Trial Tr. at 2600, 3763.) Perez saw Agostini attempt to stab Crowder as they ran. Crowder ran into the vestibule of the building at 575 East 140th Street but was unable to enter the inner door. Agostini, Cofield, Lawrence Cherry and Perez followed Crowder into the vestibule and began kicking and stabbing him. (Trial Tr. at 2602, 3766–67.) Cofield testified that he told the others that he saw a surveillance camera and that they should leave. (Trial Tr. at 2602.) He also testified that Lawrence Cherry and Perez were trying to pull Agostini away from Crowder when Agostini made a final swing with his knife, slashing Crowder's neck. (Trial Tr. at 2603.) At trial, Crowder identified Agostini in the courtroom as the assailant who slashed his throat. (Trial Tr. at 3404.)

Agostini, Cofield and Lawrence Cherry quickly left the area and went to Junebug's apartment. (Trial Tr. at 2604.) Cofield testified that Agostini told the others that he had tried to kill Crowder. When they asked him why, he said because Crowder had "tried to play me." (Trial Tr. at 2605.) According to Cofield, to "play" someone means to "walk all over" them or show that the person is "soft" or cowardly.

(Trial Tr. at 2605.) After they washed, the group went to an after-hours nightclub called George Diaz's. (Trial Tr. at 2605.)

At George Diaz's, the group met Santiago and Rodriguez. According to Rodriguez, Agostini told Santiago and Rodriguez that he had stabbed someone, "caught recreation" and "wilded out." (Trial Tr. at 1752.) Rodriguez testified that to "catch recreation" meant to enjoy harming another person and to "wild out" meant to lose control of yourself. (Id.) By Rodriguez's account, Agostini also bragged that he opened up Crowder "like a pig" and "swore that he had bodied the kid," meaning that he had killed him. (Trial Tr. at 1755.) Agostini pulled out his knife and showed them the tip, which was covered with dried blood. (Id.) Rodriguez took the knife away from Agostini to prevent him from getting into more trouble. Santiago was upset and stated that the incident would attract "heat," meaning police attention, to their block on 137th Street. (Trial Tr. at 1756.)

### 2. Discussion

■■■ The Government asserts that, by assaulting Crowder, Agostini was attempting to maintain or increase his position in Thief David's Crew. This theory presumes that Agostini was a member of the enterprise when he committed the assault. *See Ferguson,* 49 F.Supp.2d at 327 ("By its ordinary usage, the phrase 'for the purpose of . . . maintaining or increasing position in' the enterprise means that the defendant had to have held a position in the enterprise and committed the charged underlying crime of violence with a motive of retaining or enhancing that position.") (citing *United States v. Muyet,* 994 F.Supp. 550, 555 (S.D.N.Y.1998) and *Concepcion,* 983 F.2d at 381).

In the instant case, there was sufficient evidence for a rational juror to conclude that Agostini had a "position" within the enterprise. As discussed above, on numerous occasions Agostini brought his car to 137th Street and allowed Santiago and others to sit in his car while they discussed narcotics transactions, counted money and smoked marijuana. There was also evidence that Agostini helped Cofield and others transport guns for Santiago and Thief David's Crew.[16] Agostini also provided Cabrera with crack cocaine to sell on several occasions. These facts and others presented at trial were more than adequate to support a conclusion that Agostini was associated with and had a position in Thief David's Crew.[17]

Having concluded that a juror could have reasonably found that Agostini had a position within Thief David's Crew, the next question is whether Agostini assaulted Crowder for the purpose of "increasing or maintaining [his] position" within the enterprise. This question presents a more difficult issue, particularly in light of the conflicting details in the testimony about the assault. However, after carefully reviewing the evidence presented at trial, the Court concludes that a rational juror could have concluded that Agostini assaulted Crowder with a dangerous weapon, causing serious bodily injury, for the purpose of maintaining or increasing his position within Thief David's Crew.

16. Cofield testified that some time in January or February of 2000, he saw Santiago purchasing a .380 caliber gun on 137th Street. (Trial Tr. at 2579.) One evening, Santiago called Cofield and asked him to bring some guns, including the .380 gun to a nightclub because Santiago and other members of the enterprise were "having problems." (Trial Tr. at 2581.) Cofield called Agostini on his cell phone and told him that Santiago had a problem in an after-hours nightclub and that he needed a ride. Agostini arrived and he took Cofield, Lawrence Cherry, Leighton Miles (hereinafter "Miles") and "Marcus" to the nightclub. Cofield brought three guns with him: a "Mach" gun, a .357 caliber gun and a .380 caliber gun. When they arrived at the club, Cofield met Rodriguez and gave him the .380 gun. Cofield informed Rodriguez that the Mach gun and the .357 gun were in Agostini's car with Lawrence Cherry and Miles. On a subsequent day, Cofield called Agostini and told him that the .380 gun was still in his car. According to Cofield, Agostini was upset because he could have been arrested if the police found a gun in his car. Although Cofield's testimony indicated that Agostini did not want guns stored in his car for a long period of time, there was no evidence suggesting that Agostini objected to helping Cofield bring guns to the nightclub on the evening described above.

17. Although there was some evidence that Rodriguez and other members of Thief David's Crew had mixed views of Agostini,

such evidence did not undermine the possibility that a rational juror could have concluded that Agostini had a position within the enterprise. Rodriguez testified that he told Santiago and others that Agostini was a "wannabe," a "pest" and that he had no respect for Agostini. (Trial Tr. at 1907.) On another occasion, Agostini and Rivera had a fight in a nightclub. Rivera warned Agostini not to come to Santiago's Block and when Agostini did appear on the Block, Rivera attacked him. (Trial Tr. at 1878–80.) However, the conflict was later resolved and, based on Cofield's testimony, discussed above, Agostini appeared on the Block many times thereafter. Furthermore, Agostini helped Cofield bring guns to Santiago at a nightclub. Drawing all reasonable inferences in favor of the Government, a rational juror could have concluded that Agostini had a position in the enterprise, in spite of evidence that there may have been conflicting views of him among some members of the enterprise. In fact, a reasonable inference could be drawn that because certain members of the enterprise close to Santiago had doubts or dislikes about Agostini, Agostini had a strong motive and incentive to continue to prove himself and enhance his reputation in the eyes of Santiago and others, so as to overcome the reservations, earn respect and thus, maintain or increase his standing as a member of the enterprise.

As discussed above, *supra*, Part II.B, the reputation of Thief David's Crew as a strong and powerful gang was essential to its control of the narcotics business on 137th Street. Accordingly, a juror could have reasonably concluded that each member of the enterprise was concerned about his reputation for being strong and tough. This was particularly true for Agostini, since Rodriguez viewed him as a "pest" and a "wannabe." (Trial Tr. at 1907.) After Agostini assaulted Crowder, he showed Santiago and Rodriguez his knife with blood on it and bragged that he had killed someone. In light of Rodriguez's testimony that he had no respect for Agostini, the jury could have reasonably concluded that Agostini committed the assault and bragged about it later to bolster his reputation with Santiago, Rodriguez and other members of Thief David's Crew and to increase and maintain his position within the enterprise.

Furthermore, the testimony of Perez indicated that before Crowder was attacked on March 18, 2000, he insulted Agostini, Cofield and Lawrence Cherry collectively. Crowder stated that they were *all* cowards and that they were too afraid to fight. (Trial Tr. at 3715.) Such testimony undermines Agostini's claim that the assault, at most, was the result of a personal dispute solely between Crowder and himself. Just as Baerga testified that members of the enterprise were compelled to respond when Santiago was punched at The Loft, a rational juror could have concluded that Agostini, Cofield and Cherry felt compelled to assault Crowder after he had insulted them and implicitly threatened their position within the enterprise and

perhaps the reputation of the enterprise itself.[18]

If other gangs learned that members of Thief David's Crew were "too afraid to fight," the enterprise's control of the narcotics business on 137th Street potentially would have been jeopardized. *See Concepcion*, 983 F.2d at 382–383 (2d Cir.1992) (concluding that a reasonable jury could infer that defendant's purpose for killing was "maintaining or increasing [his] position" because he initiated a shootout over a trafficking location with rival narcotics dealer who posed a threat to the enterprise's control of a particular site for narcotics sales); *see also United States v. Malpeso* 115 F.3d 155, 163–164 (2d Cir. 1997) (sustaining conviction under § 1959 because jury could reasonably conclude that defendant killed to maintain or increase his "associate" position in organization); *United States v. Brady*, 26 F.3d 282, 290 (2d Cir.1994) (holding that even though defendant was only an "associate" and not a "made member," evidence could support a conclusion that he was involved in a murder conspiracy "to advance in [the] Colombo family," in violation of § 1959, and that he received assurance that he "would be taken care of when [the] war ended"); *United States v. Muyet*, 994 F.Supp. 501, 511 (S.D.N.Y.1998) (finding that a rational jury could conclude that "one of the enterprise's tenets was loyalty" to the organization and that this tenet required "actions to preserve the group's operations" and caused "members to believe that violence was expected of them"); *Tipton*, 90 F.3d at 891 (finding that a reasonable jury could find a violation of § 1959(a) because defendants killed and wounded victims while they were members

---

**18.** In addition, even if Agostini, Cofield and Lawrence Cherry were motivated by a desire to protect their personal reputations, as long as they acted, in part, to preserve or enhance the reputation of the enterprise or their posi-

tions in it, a jury could reasonably conclude that they had violated § 1959. *See United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996).

of an organization with an explicit policy of "furthering [its] reputation for violence" by "reacting violently" to affronts to its members). *But see United States v. Thai,* 29 F.3d 785, 818 (2d Cir.1994) (finding that despite defendant's leadership of the organization, a reasonable jury could not find that defendant violated § 1959 because the evidence only established a personal mercenary motive and did not indicate that defendant attempted to bomb restaurant in response to a threat to the organization or his leadership).

Although Agostini may have had other motives for committing the assault, such as to protect his personal reputation, self-promotion within the enterprise need not have been Agostini's only or sole motivation, as long as the assault and other similar crimes were an "integral aspect of membership" in Thief David's Crew. *See Concepcion,* 983 F.2d at 381 ("given that Congress intended RICO, which § 1959 complements, to 'be liberally construed to effectuate its remedial purposes,' we reject any suggestion that the 'for the purpose of' element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive") (citing Pub.L. No. 91–452, § 904(a), 84 Stat. 947 and *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

While Agostini may have a plausible argument that his assault on Crowder was nothing more than a response to a personal insult to him alone, or to him, Cofield and Lawrence Cherry collectively, this Court, when considering a Rule 29 motion, is required to draw all reasonable inferences in favor of the Government, *see Mariani,* 725 F.2d at 865, and all issues of credibility in favor of allowing the jury to determine issues of fact. *See Weiss,* 930 F.2d at 191; *Roldan–Zapata,* 916 F.2d at 802.[19] As discussed above, it was equally plausible that Agostini assaulted Crowder, in part, to maintain *and* increase his position within Thief David's Crew. One cannot always parse between the multiple motivations that may have spurred another person to act, but if there is any significant room for reasonable people to differ, a court must defer to the fact-finding role of a jury when considering a motion for acquittal under rule 29.

The fact that Agostini's assault on Crowder could have been prosecuted in state court is of no consequence here.[20] In light of the fact that a jury could have reasonably concluded that Agostini com-

**19.** Because of the Court's conclusion that there was sufficient evidence that Agostini assaulted Crowder for the purpose of maintaining or increasing his position within Thief David's Crew, the Court need not address whether Agostini was attempting to "gain entrance to" the enterprise. There was sufficient evidence at trial for the jury to conclude that Agostini already had a position within the enterprise when he assaulted Crowder.

**20.** *See* S.Rep. No. 98–225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3483–85 ("With respect to the ... offense [extending to murder, kidnaping, or serious assault committed for anything of pecuniary value or for the purpose of gaining entrance into or maintaining or increasing one's position in an organized crime group], the committee concluded that the need for federal jurisdiction is clear, in view of the federal government's strong interest ... in suppressing the activities of organized criminal enterprises, and the fact that the FBI's experience and network of informants and intelligence with respect to such enterprises will often facilitate a successful federal investigation where local authorities might be stymied.... [H]owever, the committee does not intend that all such offenses should be prosecuted federally. Murder, kidnaping, and assault also violate state law and the states will still have an important role to play in many such cases that are committed as an integral part of an organized crime operation.").

mitted the assault, in part, to maintain or increase his position in a racketeering enterprise, within the meaning of § 1959, there was sufficient evidence for this crime to be prosecuted in federal court. Accordingly, the Court denies Agostini's Rule 29 motion on Count Six.

## V. CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that defendant Williams's motion for a judgement of acquittal on all counts is DENIED; and it is further

**ORDERED** that defendant Santiago's motion for a judgement of acquittal is GRANTED with respect to Count Nine and DENIED with respect to Counts One, Two and Three; and it is further

**ORDERED** that defendant Agostini's motion for a judgement of acquittal on all counts is DENIED; and it is further

**ORDERED** that defendants file additional post-trial motions, if any, no later than July 2, 2002; and it is further

**ORDERED** that the Government file its response no later than July 16, 2002; and it is finally

**ORDERED** that defendants file replies, if any, no later than July 30, 2002.

**SO ORDERED.**